[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 27, 2010
JOHN LEY
CLERK

No. 09-10394

_____

D. C. Docket No. 07-21367 CV-PAS

JANE DOE,
by and through Jane Doe's Mother and
Father as parents and natural guardians,
JANE DOE'S MOTHER,
JANE DOE'S FATHER,
individually,

Plaintiffs-Appellants,

versus

SCHOOL BOARD OF BROWARD COUNTY, FLORIDA,
DR. SAM SCAVELLA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 27, 2010)

Before WILSON and ANDERSON, Circuit Judges, and RESTANI,[*] Judge.

---

[*] Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

ANDERSON, Circuit Judge:

Jane Doe brought this action, by and through her parents, against the Broward County School Board ("the School Board") and Dr. Sam Scavella, former principal of her high school ("Scavella"), alleging that she was the victim of sexual harassment by her math teacher. Her complaint included claims under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et. seq., and 42 U.S.C. § 1983. The district court granted summary judgment in favor of both defendants. Doe now appeals, arguing that disputed issues of fact remain as to the School Board's liability under Title IX and § 1983, making summary judgment improper, and that Scavella is not protected by qualified immunity from liability under § 1983. Because we find that a reasonable jury could conclude that the School Board responded with deliberate indifference to actual notice of sexual harassment, we reverse the district court's grant of summary judgment with respect to Doe's Title IX claim. We affirm the district court's grant of summary judgment in favor of both the School Board and Scavella with respect to Doe's § 1983 claims.

## I. FACTS AND PROCEDURAL HISTORY

In reviewing a grant of summary judgment, we are required to view the facts in the light most favorable to the nonmoving party. <u>Sauls v. Pierce County Sch.</u>

Dist., 399 F.3d 1279, 1281 (11th Cir. 2005). Therefore, we set forth the facts in the light most favorable to Doe.

Jane Doe was a fifteen-year-old ninth-grade student at Blanche Ely High School ("Blanche Ely") during the 2006-2007 school year. During that year, Doe was a student in Conraad Hoever's math class. According to Doe's complaint, in March 2007, Hoever sexually assaulted her in his classroom.[1] Blanche Ely's current principal requested a formal investigation, which resulted in Hoever's administrative leave and ultimate termination. Although this was the first instance of sexual harassment by Hoever of Doe, two other female students had previously filed complaints against Hoever for sexual harassment and misconduct. It is the School Board's and Principal Scavella's response to these complaints that forms the basis of Doe's Title IX and section 1983 claims.

The School Board first hired Hoever as a full-time math teacher at Blanche Ely in December 2002. At the end of the 2003-2004 school year, Blanche Ely's principal decided not to renew Hoever's annual contract because of poor teaching and classroom management skills. Dr. Scavella became Blanche Ely's principal at the beginning of the 2004-2005 school year and recommended to the School Board

---

[1] Doe claimed that Hoever pinned her against a classroom wall, lifted her skirt, digitally penetrated her, and then rubbed his penis against her vagina.

3

that Hoever be reinstated. It was during the 2004-2005 school year, when Scavella was acting principal, that two different female students filed complaints against Hoever.

A. First Complaint Against Hoever—The K.F. Incident.

K.F. was an eleventh-grade student in Hoever's math class. In October 2004, she filed a complaint with Blanche Ely about three incidents occurring in Hoever's classroom. According to her written complaint, during the first week of school K.F. visited Hoever's classroom to ask for assistance with homework. During their meeting, Hoever made inappropriate comments to her, telling her she was "beautiful," "sexy," had a "flat stomach," and a "beautiful smile," and then gave her his phone number. K.F. told another student, Cassandra, about Hoever's conduct the day after the incident. The second incident occurred a few weeks later when Hoever asked K.F. to remain after class. While alone with K.F. in his classroom, Hoever told her that he loved her, wanted to do "business" with her, and wanted her to be his girlfriend because she needed someone "special" to take care of her. When K.F. said she had to go to lunch, Hoever approached her, lifted up her shirt, and commented on her "flat stomach" and her "sexy" physique. K.F. told her cousin about Hoever's advances, and the cousin in turn told K.F.'s legal guardians. Her cousin gave her a tape recorder to secretly record Hoever's

4

comments but her attempt was unsuccessful. Finally, in late October, K.F. alleged that she approached Hoever about her "D" grade in his class, and Hoever told her that she "couldn't have a good grade" because she did not "want to do business." That day, K.F. reported all of Hoever's alleged sexual advances to Principal Scavella.

Principal Scavella responded by conducting an informal on-site investigation of the alleged misconduct and requested written statements from K.F. and Hoever. In his written statement, Hoever admitted that on one occasion K.F. had asked him to help find her a sponsor for her modeling career, and he had stated that she was "tall, slim, and sexually appealing" for the job, but that finding her a sponsor was "strictly business." Hoever also stated that he had removed K.F. from his class earlier that day for being disruptive and that K.F. had threatened to go to Scavella on numerous prior occasions, saying "You don't know what I can do."[2]

Scavella then contacted the School Board's Special Investigative Unit ("SIU") and requested a formal investigation through the filing of a Personal Investigation Request, which classified the incident as "sexual harassment." The following day, SIU Executive Director Dr. Melita assigned the investigation to

---

[2] K.F. admitted in her deposition that Hoever ejected her from class that day and that she had been "fighting for her grade."

Officer Wollschlager. The School Board also provided Hoever with notice of the formal SIU investigation and directed him not to "engage the complainant . . . in any conversation regarding the matter under investigation"; placed him on administrative leave pending the outcome of the investigation; and banned him from returning to the high school premises.

Investigator Wollschlager interviewed K.F. and obtained her sworn taped testimony about the incident, which largely tracked her prior statements except for the inclusion of an additional incident in which Hoever told her if she "did business" with him then she would not "ever have to work hard" and could have a "B" grade in his class. In his taped sworn statement, Hoever stated that K.F. was a poor student with behavioral problems who had threatened to go to Scavella on several occasions if she did not get a good grade in his class. He also denied ever commenting to K.F. that he wanted to take care of her, "do business," or that he picked up her shirt and commented on her stomach.

Wollschlager also met with two other students who both stated that they had not seen K.F. and Hoever ever speaking after class. Wollschlager did not interview K.F.'s friend Cassandra, her cousin, or her guardians, the only individuals who allegedly knew of the incidents, because he determined that they had no first-hand knowledge of the events and could only report what K.F. told them. A senior staff

6

member at SIU reviewed the Wollschlager report that the evidence was inconclusive as to whether any sexual misconduct occurred, and the report was sent to the Professional Standards Committee, of which Melita was a member, for a "probable cause" or "no probable cause" finding. The Committee recommended that no probable cause existed for additional disciplinary action against Hoever due to the inconclusive results of the investigation and the fact that the incident was "1 on 1 – no video – no eyewitnesses." Pursuant to school policy, Hoever returned to teach at Blanche Ely for the second semester of the 2004-2005 school year.

B. Second Complaint Against Hoever—The S.W. Incident

Upon his return, Hoever taught an algebra class in which S.W., a tenth-grader, was a student. S.W. filed a complaint against Hoever in May 2005 regarding two incidents of sexual harassment. According to her complaint, some time during the semester Hoever asked her, in response to a question about a math problem, if she wanted to "ride around with him" over the weekend. She declined. Then in May, she and four other female students were listening to music at Hoever's desk during class. Some of the students departed, leaving only S.W. and one other student, Naomi, with Hoever in the classroom. Hoever started making a compact disc of music for S.W. and Naomi, and he allegedly touched S.W.'s leg while trying to hold her hand. At some point, Naomi left, and Hoever and S.W.

7

remained in the classroom alone. He commented that S.W. seemed "very grown up," that he liked how "soft" her hands feel and how her "lips look." Then, according to S.W., Hoever "came around his desk to where I was standing and told me to pull up my jacket and my shirt so he can see my stomach." Hoever followed S.W. as she left the classroom, gave her the compact disc, and appeared to be waiting for her "to give him a hug."[3] She reported the incident immediately. In her deposition, S.W. testified that she had not reported the first incident because she knew that Hoever had gotten in trouble for the same thing before; the school had "only suspended him" in response; and the school was "not going to do anything about it because he's friends with the principal."

In response to S.W.'s complaint, Scavella testified that he directed the Assistant Principal to conduct an informal on-site investigation.[4] Several students, none of whom were named in S.W.'s complaint, were asked to give written statements about the incident, and Scavella called Hoever for a statement. Notably, the students interviewed did not include S.W.'s friend Naomi, the only student

---

[3] In her deposition, S.W. also testified that Hoever seemed to be attempting to block her from leaving the room by getting in front of the door. However, because this was not included in her written report and because she was not interviewed as a part of Scavella's informal investigation, we cannot be sure that this fact was known by Scavella at the time he evaluated the seriousness of her complaint.

[4] The Assistant Principal denied being involved in any investigation.

named in her complaint, and included some male students, even though S.W.'s complaint reported that "four girls" were with her at Hoever's desk on the day of the incident. The interviewed students denied witnessing anything improper between Hoever and S.W. In his statement, Hoever denied the allegation, claiming that he had only pushed S.W.'s hand away when she reached toward his lap top computer, but admitted to using class time to make compact discs for students. No one interviewed S.W. about the incident after she filed her written complaint.

Scavella then called Dr. Melita, the SIU Personnel Director, and reported that the school's informal investigation did not support S.W.'s complaint or the allegation that Hoever made inappropriate comments or touched her leg. Melita testified that Scavella did not inform him that Hoever was the teacher involved. Scavella testified that he did not remember whether he told Melita that Hoever was the accused teacher and that he did not draw a connection between the similarities in the K.F. and the S.W. complaints at the time. After hearing from Scavella that he thought students were ganging up on a teacher, Melita concluded that the complaint did not warrant formal investigation. Scavella handled the matter on-site by giving Hoever a letter of reprimand for using class time to make compact discs. No one ever advised S.W. about the final disposition of her complaint. Because the S.W. incident occurred at the end of the school year, S.W. was permitted to take her

9

final exam in the front office. No other administrative action was taken.

After the 2004-2005 school year, Scavella resigned as Blanche Ely's principal. Before resigning, Scavella gave Hoever a "satisfactory" performance evaluation and recommended that he be retained for the 2005-2006 school year. The new principal was not informed of the prior complaints against Hoever. There is no record evidence that any continued monitoring of Hoever occurred. The record contains no additional complaints against Hoever until Doe's sexual assault in March 2007.

C. The Instant Suit

Doe filed this federal lawsuit in the Southern District of Florida, alleging various claims under Title IX and § 1983 and requesting relief in the form of compensatory and punitive damages. Doe's Amended Complaint alleged that the School Board sexually discriminated against her in violation of Title IX by exhibiting deliberate indifference to known prior harassment by Hoever against female students at Blanche Ely High School (Count III). She also alleged that the School Board and Scavella violated her constitutional right not to be sexually abused by a state official acting under color of law pursuant to § 1983 due to the School Board's policy, practice, or custom of conducting cursory investigations of student complaints (Count I) and Scavella's deliberate indifference to the risk of

10

sexual abuse of Blanche Ely students (Count IV).[5]

The School Board and Scavella filed separate Motions for Summary Judgment, with Scavella asserting the defense of qualified immunity. The district court granted summary judgment for both defendants. The district court held that the evidence could not support a finding that the School Board acted with deliberate indifference under Title IX or that it had a policy, practice, or custom in violation of § 1983. The court also determined that Doe failed to show a causal connection between Scavella's actions and Doe's sexual assault. Therefore, the court determined that Scavella was entitled to summary judgment with respect to Doe's § 1983 claim. This appeal ensued.

## II. STANDARD OF REVIEW

We review <u>de novo</u> a district court's grant of summary judgment, applying the same legal standards as the district court. <u>Johnson v. Bd. of Regents of Univ. of Ga.</u>, 263 F.3d 1234, 1242 (11th Cir. 2001). These legal standards dictate that we are required to resolve all reasonable inferences in favor of the non-moving party and that summary judgment should be upheld only if the pleadings show that there is no issue as to any material fact and the moving party is entitled to judgment as a

---

[5] Doe does not appeal the dismissal of her § 1983 failure-to-train claim against the School Board (Count II).

matter of law.  Hawkins v. Sarasota County Sch. Bd., 322 F.3d 1279, 1280–81 (11th Cir. 2003).  Therefore, "[i]f a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion."  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

## III.  DISCUSSION

### A.  The School Board's Liability under Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has recognized an implied right of action for money damages in Title IX cases of intentional sexual discrimination and has held that a teacher's sexual harassment of a student constitutes actionable discrimination under Title IX.  Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 75–76, 112 S. Ct. 1028, 1037–38 (1992).  In the case of teacher-on-student sexual harassment, our analysis is governed by the Supreme Court's decision in Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S. Ct. 1989 (1998).

In Gebser, the Supreme Court made plain that not all sexual harassment by teachers is sufficient to impose liability on a school district. Because "Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation," id. at 290, 118 S. Ct. at 1999 (citing 20 U.S.C. § 1682), the Court explained that school districts may not be held liable on a theory of respondeat superior or mere constructive notice, id. at 285, 118 S. Ct. at 1997. Rather, Title IX liability arises only where "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." Id. at 277, 118 S. Ct. at 1993.

Therefore, applying the Gebser framework to the summary judgment context requires three related inquiries. First, the plaintiff must be able to identify an "appropriate person" under Title IX, i.e., a school district official with the authority to take corrective measures in response to actual notice of sexual harassment. See Floyd v. Waiters, 171 F.3d 1264, 1264 (11th Cir. 1999). Second, the substance of that actual notice must be sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment. See Gebser, 524 U.S. at 291, 118 S. Ct. at 2000. And finally, the official with such notice must exhibit deliberate indifference to the harassment. See Sauls, 399 F.3d at 1284.

13

*i.     Appropriate Person*

Because the district court concluded that the School Board did not act with deliberate indifference, it found it was "not necessary to reach the issue of whether [the School Board] had actual notice of Hoever's misconduct." Likewise, the court did not address "who, within the school system, must have notice of the harassment for the school board to be considered to have actual knowledge." See Hawkins, 322 F.3d at 1285.

The Supreme Court has not clearly delineated which school officials are appropriate persons for purposes of Title IX actual notice. Nor has our circuit. In a pre-Gebser decision, we held that actual notice to a direct supervisor of a school janitor, who was "at least three levels removed from the superintendent of schools position," could not expose the school district to Title IX liability. Floyd v. Waiters, 133 F.3d 786, 793 & n.15 (11th Cir. 1998), vacated by 525 U.S. 802, 119 S. Ct. 33 (1998), reinstated in 171 F.3d 1264 (11th Cir. 1999). In reinstating our decision in light of Gebser, we articulated our only elaboration of the Supreme Court's "appropriate person" requirement, commenting that the official with notice of the harassment must be "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." Floyd, 171 F.3d at 1264, cert. denied, 528 U.S. 891, 120 S. Ct. 215

14

(1999). A janitorial supervisor was plainly not "high enough up the chain-of-command" for his deliberate indifference to known harassment to impose liability on the school district. See id. Our subsequent panels facing the question have elected to rest their Title IX holdings on other grounds, bypassing the issue. See, e.g., Hawkins, 322 F.3d at 1288 (refraining from addressing the question of whether a teacher could be a source of actual notice to the school board in a student-on-student sexual harassment case); Davis v. DeKalb County Sch. Dist., 233 F.3d 1367, 1372 (11th Cir. 2000) (stating it was "unnecessary to decide whether Duncan, as principal of Knollwood Elementary, was a supervisory official with authority to take corrective action on behalf of the school district").

Here, it is undisputed that the principal of Blanche Ely High School, Sam Scavella, had actual notice of the K.F. and S.W. complaints. Both K.F. and S.W. filed written complaints with Blanche Ely of Hoever's alleged harassment, which Scavella reviewed and acted upon. Doe has litigated her case on the theory that Scavella is an "appropriate person" to receive Title IX actual notice, although neither party has briefed this issue. Neither the School Board nor Scavella has contested—before the district court or on appeal—Doe's assertion that Scavella's actual notice of the prior complaints could form the basis of the School Board's Title IX liability. More importantly, both the School Board and Scavella conceded

15

at oral argument that Principal Scavella could "initiate corrective action" or place "other restrictions" on an offending teacher in response to a sexual harassment complaint, even if he could not take final adverse employment actions such as terminating the teacher. Therefore, we treat Scavella as an "appropriate person" to receive actual notice under Title IX for purposes of this appeal.[6]

Even if the parties disputed this issue, we would not hesitate in concluding that Principal Scavella, as the highest-ranking school official on site at Blanche Ely High School, was "high enough on the chain-of-command" to impute liability to the School Board. This position is in harmony with the Supreme Court's treatment of Title IX claims. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 653–54, 119 S. Ct. 1661, 1676 (1999) (extending Title IX liability and Gebser's actual notice and deliberate indifference requirements to the context of student-on-student sexual harassment); Gebser, 524 U.S. at 291, 118 S. Ct. at 2000.

In both Gebser and Davis, the school principal was the highest school district official with knowledge of the alleged sexual harassment. And in both cases the Court appeared to presume that the principal could be an appropriate person under

---

[6] Because the School Board concedes that Principal Scavella could institute "corrective measures" in response to known harassment, we need not address whether other school district officials, such as Dr. Melita as Executive Director of the School Board's Special Investigative Unit, also had actual notice of the complaints. Although Dr. Melita had actual knowledge of the K.F. complaint, he lacked notice of material facts surrounding the S.W. complaint, such as Hoever's identity as the accused teacher, due to Scavella's lack of disclosure.

Title IX's enforcement scheme. In <u>Gebser</u>, it was the substance of the actual notice to the principal, not his identity, that was fatal to the plaintiff's Title IX claim. <u>See</u> 524 U.S. at 291, 118 S. Ct. at 2000 (affirming summary judgment because a teacher's inappropriate comments were "plainly insufficient to alert the principal to the possibility" that teacher was involved in a sexual relationship with a student). In <u>Davis</u>, the Court held that the plaintiff had sufficiently pled a claim for relief under Title IX where she alleged that her daughter was the victim of repeated acts of sexual harassment and no disciplinary action was taken by the school or school board. 526 U.S. at 653–54, 119 S. Ct. at 1676. Significantly, the Court found that "[t]he complaint also suggest[ed] that petitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board." <u>Id.</u> at 654, 119 S. Ct. at 1676.

Moreover, the majority of our sister circuits addressing the issue have interpreted the <u>Gebser</u> and <u>Davis</u> opinions as standing for the proposition that at least in some circumstances, if not generally, a principal enjoys ample authority to "take corrective measures" in response to allegations of teacher or student sexual harassment. <u>See Plamp v. Mitchell Sch. Dist. No. 17-2</u>, 565 F.3d 450, 457 (8th Cir. 2009) ("It is apparent from Supreme Court precedent, however, that school principals are considered 'appropriate persons' in the Title IX analysis."); <u>Warren</u>

17

ex rel. Good v. Reading Sch. Dist., 278 F.3d 163, 171 (3d Cir. 2002) ("[W]e think that a school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX."); Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 259 (6th Cir. 2000) (upholding jury verdict and concluding that student satisfied actual notice requirement where student informed the principal about a teacher's sexual misconduct); Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1247 (10th Cir. 1999) (finding "little room for doubt that the highest-ranking administrator at GWHS exercised substantial control of" a harassing student during school hours so that her "knowledge may be charged to the School District"). See also Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 384 (5th Cir. 2000) (assuming without deciding that the principal was an official with the power to remedy discrimination on behalf of the school district). But see Baynard v. Malone, 268 F.3d 228, 239 (4th Cir. 2001) (holding over a vigorous dissent that a principal cannot be the recipient of actual notice where the principal has "no independent authority to suspend, reassign, or terminate" offending teachers).

However, we also note that the ultimate question of who is an appropriate person is "necessarily a fact-based inquiry" because "officials' roles vary among school districts." Murrell, 186 F.3d at 1247. Nonetheless, we find ample support

18

in the specific factual context here to accept the parties' concession of Scavella as an appropriate person within Title IX's administrative scheme. The record reflects the School Board's express delegation of authority to district principals to take corrective measures in response to sexual harassment complaints. According to the School Board's "Incident Process for Administrative Action," the principal, as school administrator, is imbued with absolute discretion at a "key decision point" in the administrative process. It is the principal who has responsibility to conduct the first on-site investigation; who enjoys discretion to request formal investigation or proceed informally; and who can determine that a complaint is meritless and requires no further inquiry. In other words, the School Board policies in this case delegated to Principal Scavella the authority to conduct the first on-site investigation, to decide that the complaint had no merit, and to terminate the investigation at that point. This is what Scavella did with respect to S.W.'s complaint.

Furthermore, we do not think that the Supreme Court, in recognizing a private right of action under Title IX against school districts for sexual harassment of students, intended to insulate school districts from liability where the "highest ranking school official present at the school every day" who is typically "the first line of responsibility for ensuring that the students in her school are safe" has

19

actual knowledge of a teacher's sexual harassment of students. See Baynard, 268 F.3d at 242–43 (Michael, J., dissenting in part). Nor are we persuaded by the Fourth Circuit's minority position that the Supreme Court intended final employment decisions such as suspending, terminating, or reassigning an offending teacher to be the only corrective measures giving an official the power to remedy sexual harassment. See id. at 239. Here Scavella, as principal, is equipped with many other means of deterring or stopping sexual harassment of students, such as admonishing the teacher, conducting a thorough preliminary investigation, swiftly reporting the abuse, and monitoring the teacher's behavior. Therefore, we treat Principal Scavella as an "appropriate person" to receive Title IX actual notice for purposes of this appeal.

### ii.    Actual Notice

We now turn to our second inquiry under Title IX's actual notice requirement: whether the K.F. and S.W. complaints were sufficient in substance to alert Scavella to the possibility of Doe's sexual assault. Although the district court found it unnecessary to reach this issue, it stated in dicta that the K.F. and S.W. complaints were insufficient to provide actual notice to the School Board of Doe's harassment for two reasons: Doe's sexual assault was the first incident of harassment by Hoever against Doe specifically; and the K.F. and S.W. complaints

20

alleged only inappropriate conduct that did not rise to the level of Doe's violent sexual assault. We agree with Doe that the district court too strictly construed Gebser's actual notice requirement in emphasizing these two distinctions.

First, no circuit has interpreted Gebser's actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff herself. See, e.g., Escue v. N. Okla. Coll., 450 F.3d 1146, 1154 (10th Cir. 2006) ("Although Gebser makes clear that actual notice requires more than a simple report of inappropriate conduct by a teacher . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.") (internal quotation and citation omitted); Baynard, 268 F.3d at 238 n.9 ("We note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being abused.").

Notably, we have held in a Title IX student-on-student harassment case that the plaintiff sufficiently alleged actual notice where the primary substance of that notice differed significantly from the circumstances of the plaintiff's harassment. See Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1288–90, 1294 (11th Cir. 2007). In Williams, we held that a Title IX plaintiff who suffered a violent sexual assault in a UGA basketball player's dorm room sufficiently alleged actual notice to UGA and its Athletic Department to withstand a motion to dismiss.

21

Id. at 1294–95.  Relevant to the court's analysis of actual notice was the basketball player's prior sexual harassment of a female store clerk and employees from the player's former university, which were both out-of-state incidents occurring two years before the plaintiff's assault.  On the authority of Williams, we reject the School Board's argument that the substance of the complaints with respect to K.F. and S.W. differed from Doe's to the extent that the prior incidents provided no notice, and we further reject the School Board's contention that, because there was no additional harassment in the intervening twenty-one months between the S.W. complaint and Doe's sexual assault, there could be no actual notice of the possibility of Doe's sexual assault.

With respect to the district court's second point, Gebser does hold that some prior allegations of harassment may be sufficiently minimal and far afield from the conduct underlying the plaintiff's Title IX claim that they would not alert a school district official of the risk of a Title IX plaintiff's sexual harassment.  524 U.S. at 291, 118 S. Ct. at 2000 (holding that a teacher's sexually suggestive comments during class were "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student").  Similarly, we have held that there was no actual notice of the potential sexual molestation of plaintiffs where the only prior complaint against the teacher alleged an "incidental

22

touching" during a touch football game and a "perceived imminent" touching at a public water fountain. Davis, 233 F.3d at 1373. However, the K.F. and the S.W. complaints alleged far more than an incidental touching or mere inappropriate comments.

Unlike the harassment allegations in Gebser, which consisted solely of comments made to a group of students during class time, K.F. and S.W. both alleged overtly sexual conduct with both a verbal and physical component, directed at them individually, occurring while the students were alone with Hoever in his classroom.[7] Both students accused Hoever of propositioning them on more than one occasion for dates and sex and commenting on their bodies in a sexual manner. In the case of K.F., she alleged that Hoever physically lifted up her shirt to look at her stomach. In the case of S.W., she alleged that Hoever told her to lift up her shirt and touched her leg while trying to hold her hand. Moreover, unlike the prior allegations of harassment in Davis, these alleged touchings did not occur in a context in which touching a student may have been appropriate or accidental, such as an athletic event. Nor did the prior allegations against Hoever involve only a

---

[7] The Gebser plaintiff alleged that the teacher with whom she ultimately had a sexual relationship also directed his sexually suggestive comments to her both in class and when they were alone together in his classroom. 524 U.S. at 277–78, 118 S. Ct. at 1993. However, she did not report this harassment; it was other students' complaints that she alleged provided notice to the principal of the harassment. Id.

23

single complaint of a targeted incident against a student.

Moreover, as our decision in Williams demonstrates, lesser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter. In Williams, the plaintiff, who was a victim of a violent sexual assault and rape in a UGA basketball player's dorm room, did not allege that the University had actual notice of the player's history of raping female students. See 477 F.3d at 1294. Yet we still found her complaint sufficient to withstand a motion to dismiss where she alleged that the University actively recruited the player and failed to sufficiently monitor his behavior despite actual notice of a history of lesser sexual harassment. See id. The player had allegedly groped female employees by "putting his hands down their pants" and "whistled at and made lewd suggestions to a female store clerk." Id. at 1290. If these unrelated incidents could state a Title IX claim, the harassment alleged in the K.F. and S.W. complaints, which resembled Doe's assault in significant respects—all incidents occurred in Hoever's classroom, between classes, and with his female math students—could provide actual notice to the School Board.

We also do not find it determinative of the School Board's liability that the results of the K.F. and S.W. investigations were ultimately inconclusive as to

24

Hoever's actual sexual misconduct. Even if prior complaints by other students are not clearly credible, at some point "a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children." Escue, 450 F.3d at 1154 (internal citation and quotation omitted). See also Williams v. Paint Valley Local Sch. Dist., 400 F.3d 360, 363 (6th Cir. 2005) (requiring actual notice that a teacher poses a "substantial risk of sexual abuse to children in the school district"). A reasonable jury could find that Scavella had such knowledge. The K.F. and S.W. complaints, when viewed collectively, provided actual notice to Principal Scavella of a pattern of sexual harassment and a series of related allegations occurring over a period of nine months in Hoever's math classroom. We think these allegations are sufficient to satisfy Doe's burden of raising a material issue of fact on the issue of actual notice. The simple fact that these prior incidents were unconfirmed and did not escalate to a violent sexual assault akin to Doe's cannot as a matter of law absolve the School Board of Title IX liability.

### iii. Deliberate Indifference

In addition to requiring that an appropriate person have actual notice of the teacher's misconduct, a Title IX plaintiff must show that the official was deliberately indifferent to that misconduct. Gebser, 524 U.S. at 277, 118 S. Ct. at 1993. Deliberate indifference is an exacting standard; school administrators will

25

only be deemed deliberately indifferent if their "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648, 119 S. Ct. at 1674. In essence, Title IX's premise "is an official decision by the recipient not to remedy the violation." Gebser, 524 U.S. at 290, 118 S. Ct. at 1999.

The district court concluded that the School Board was not deliberately indifferent to Hoever's misconduct because "Scavella confronted Hoever, obtained statements from each student who lodged complaints against Hoever, and informed [the Special Investigative Unit] of the sexual misconduct allegations." The district court reasoned that although these actions were ultimately ineffective in preventing Hoever's assault of Doe, as a matter of law they were not "clearly unreasonable in light of the known circumstances." We disagree.

Although it would be mere speculation to conclude that a perfect investigation and more vigorous response to the complaints would have prevented Doe's sexual assault, that is not our inquiry here. We only face the question of whether the district court erred in concluding that a jury, as a matter of law, could not find that Scavella's response to the K.F. and S.W. complaints was clearly unreasonable under the known circumstances. Viewing the facts in the light most favorable to Doe, we conclude that she raised a material issue of fact as to whether

26

the School Board was deliberately indifferent to Hoever's alleged sexual misconduct. See Sauls, 399 F.3d at 1287 (affirming summary judgment for school district because plaintiff failed to create a genuine issue of material fact that it acted with deliberate indifference). Therefore, the district court erred in granting summary judgment to the School Board.

We reach this conclusion even though it is undisputed that Principal Scavella and the School Board took some action in response to K.F. and S.W.'s sexual harassment allegations. Granted, this is not a situation in which a school district "made no effort whatsoever either to investigate or to put an end to the harassment." Davis, 526 U.S. at 654, 119 S. Ct. at 1676. In Davis, the Supreme Court had no trouble concluding there that a failure to take any disciplinary action in response to a student's "severe, pervasive, and objectively offensive" harassment of a peer could constitute deliberate indifference under Title IX's standard.[8] Id. at 653, 119 S. Ct. at 1676 (reversing district court's dismissal of plaintiff's Title IX complaint). Here, in fact, the School Board's response to the K.F. complaint was thorough, albeit deficient in some respects. After K.F. filed her complaint

---

[8] In Davis, a male student attempted to touch a female student's breasts; spoke in vulgar language to her; told her "I want to get into bed with you" and "I want to feel your boobs"; and placed a door stop in his pants and acted in a suggestive manner toward her. 526 U.S. at 633–636, 119 S. Ct. at 1666–68. The school did not discipline the student, separate the plaintiff from the student, or establish a sexual harassment policy or procedure. Id. at 634–35, 119 S. Ct. at 1667.

27

regarding three incidents of sexual harassment by Hoever, Scavella obtained written statements from Hoever and K.F., timely reported the incident to the School Board's Special Investigative Unit, and in his discretion requested a formal investigation. The School Board placed Hoever on administrative leave for the remainder of the semester. An investigator interviewed both K.F. and Hoever, obtained their sworn statements, and filed a report with the School Board's Professional Standards Committee. The Committee reviewed the investigative report and concluded that there was insufficient evidence to support "probable cause" for further disciplinary action against Hoever.

If we were examining the School Board's response to the K.F. incident alone, it is unlikely that this investigation, though imperfect, could be viewed as "clearly unreasonable in light of the known circumstances." Even though the investigator arguably should have interviewed other witnesses, including K.F.'s guardians, her cousin, and her friend Cassandra—who could have corroborated K.F.'s claim that the sexual harassment was ongoing and not just a fabrication to dispute her "D" grade in Hoever's class[9]—this omission cannot be said to represent a decision by the School Board effectively "not to remedy the violation." See

_____

[9] According to the School Board's Special Investigative Unit's Enforcement Procedures for Personnel Investigations: "All witnesses or persons mentioned in the initial investigation should be contacted and interviewed."

28

Gebser, 524 U.S. at 290, 118 S. Ct. at 1999. K.F.'s complaint was the first allegation of sexual misconduct against Hoever by a Blanche Ely student. Therefore, even the School Board's failure to institute informal corrective measures such as admonishing Hoever to avoid his female students between classes or monitoring his classroom for the appearance of any impropriety probably would not, as of this stage, render the School Board's response clearly unreasonable "in light of the known circumstances."

However, the "known circumstances" from which we evaluate the reasonableness of a School Board's response changed significantly once S.W. filed her complaint. It is the School Board's response to this complaint, in light of the known circumstance that a prior female student had also accused Hoever of sexual harassment in the same school year, that we conclude raises a sufficient fact issue of deliberate indifference to overcome the School Board's summary judgment motion. Although we have recognized that a school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing the plaintiffs, Davis, 233 F.3d at 1375, we also agree with the Sixth Circuit that "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior," Vance, 231 F.3d

29

at 261 (affirming jury verdict for plaintiff and denial of school district's Rule 50 motion for judgment as a matter of law). Once Scavella had actual notice of a second complaint, his failure to institute any corrective measures aimed at ferreting out the possibility of Hoever's sexual harassment of his students could constitute deliberate indifference.

Although S.W.'s allegations against Hoever were not as serious as those alleged by K.F., they still constituted sexual harassment. Taking reasonable inferences from the summary judgment record in Doe's favor, Hoever asked K.F. to "ride around with him" during the weekend, essentially asking a student for a date; he tried to hold her hand; he made sexually suggestive comments about her lips; and asked her to lift up her shirt to show him her stomach. In response to a complaint containing these allegations, and with the knowledge of their similarity to K.F.'s prior allegations, Principal Scavella effectively did nothing other than obtain a written statement from S.W. and Hoever. There was no investigation, formal or informal. No one interviewed S.W. No one interviewed Naomi, S.W.'s friend who was named in her complaint. Instead, an unidentified person obtained written statements from five students who appeared to have no connection to S.W.'s allegations. Notably, these students included males, despite the fact that S.W.'s complaint stated that four girls surrounded Hoever's desk the day of the

incident.

Most unreasonably, and almost incredibly, however, is the fact that when Scavella made a telephone call to Dr. Melita regarding the S.W. complaint, he did not advise Dr. Melita that Hoever was the accused teacher. Dr. Melita did not question Scavella as to whether the teacher had a prior history of harassment complaints, and Scavella admitted in his deposition that he did not at the time draw a connection between the K.F. and S.W. incidents.[10] Thus, a reasonable jury could conclude that Scavella had full knowledge of the K.F. complaint and the subsequent investigation of Hoever yet he knowingly failed to apprise Dr. Melita that the S.W. complaint involved a sexual harassment allegation against the same teacher who had been the subject of a formal investigation just months earlier. Instead, Scavella recommended that no further investigation occur, and his only subsequent remedial actions taken were permitting S.W. to take her final exam in the school office instead of Hoever's classroom and placing a letter in Hoever's file admonishing him for using class time to make students compact discs of music. Scavella completed his tenure at Blanche Ely High School by giving Hoever a "satisfactory" performance rating and recommended his retention for the following

_____

[10] The School Board's "Recommended Guidelines for Preliminary at the Site Investigations" requires principals to "Locate any past complaints regarding the employee and their disposition."

31

school year. The incoming principal was never informed of Hoever's history, no informal warning was issued for Hoever to avoid female students, and no recommendation was made to monitor Hoever's classroom.

In granting summary judgment for a school district in our prior decisions, we have repeatedly recognized that a school district's reasonable response to sexual harassment may include corrective action such as monitoring and admonishing an accused teacher or student despite the inconclusive nature of the school's investigation into the misconduct. See Sauls, 399 F.3d at 1285–86 (explaining that school officials "investigat[ed] the allegations," "interview[ed] the relevant parties," and "also consistently monitored Blythe's conduct and warned her about her interaction with students"); Davis, 233 F.3d at 1373–74. In Sauls, after a first incident, "[e]ven though Williamson failed to find any evidence supporting the allegation, he nonetheless issued a warning to Blythe. He directed Blythe to avoid any situation that could be construed as inappropriate and warned that her interaction with students must always be beyond reproach." 399 F.3d at 1286. After a second incident, "[a]lthough PCSD still did not have any evidence of misconduct by Blythe, Dr. Williams took corrective action[,] . . . admonish[ing] Blythe both orally and in writing, and direct[ing] her to avoid even the appearance of impropriety when dealing with students." Id. And finally, after a third incident,

32

a school official instructed the new high school principal "to closely monitor Blythe and Dustin, to prevent any unnecessary contact between the two, and to report any suspicious behavior." Id. at 1287. Similarly, in Davis, we explained that "[e]ven though the investigation failed to reveal reasonable evidence of inappropriate conduct by Mency, Duncan took immediate corrective action." 233 F.3d at 1373. "Duncan instructed Mency to avoid all contact with Burrell other than class;" "Duncan also forbade Mency from being alone with Burrell or any female student;" and "Duncan also monitored Mency for any indiscretions." Id. at 1374.

These school districts seemed to recognize that inconclusive investigations are common, especially when alleged harassment occurs behind closed doors. Therefore, a reasonable response under the known circumstances may include taking informal corrective action in an abundance of caution to ensure that future misconduct does not occur. Here, once it was a known circumstance that Hoever had been accused of multiple acts of sexual harassment in his classroom behind closed doors, such cautionary measures could have contributed to the reasonableness of the School Board's response.

In the summary judgment posture of this case, we of course take all reasonable inferences in Doe's favor. After a careful review of the record and for

the foregoing reasons, we conclude that Doe has adduced sufficient evidence to create a genuine issue of material fact as to whether Scavella's response to the cumulative complaints of K.F. and S.W. was clearly unreasonable in light of the known circumstances. Additionally, we find that Doe has sufficiently alleged causation. As we concluded in Williams, a reasonable jury could also find that these deficiencies caused Doe's sexual harassment by "substantially increas[ing] the risk faced by female students" at Blanche Ely. See Williams, 477 F.3d at 1296 (reversing the district court's dismissal of plaintiff's Title IX complaint because "placing Cole in a student dormitory and failing to supervise him in any way or to inform him of their expectations of him under the applicable sexual harassment policy . . . substantially increased the risk faced by female students at UGA").

In sum, we cannot say that as a matter of law it was reasonable for Scavella to ignore an alleged pattern of sexual misconduct by one of Blanche Ely's teachers, failing to even inform the SIU of Hoever's identity in relation to S.W.'s complaint. Nor can we accept the district court's conclusion that merely because school officials "confronted Hoever," "obtained statements" from the complaining students, and "informed the SIU of the sexual misconduct allegations" (while omitting material details), the School Board's response was reasonable. To do so would permit future school districts to satisfy their obligations under Title IX

34

without ever evaluating the known circumstances at all. The Title IX inquiry is contextual: it does not require school districts to simply do something in response to sexual harassment; rather, they must respond in a manner that is not "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648, 119 S. Ct. at 1674 (emphasis added). We conclude that the district court erred in holding that despite these serious deficiencies the School Board's response was not deliberately indifferent as a matter of law.

B. The School Board's Municipal Liability under § 1983

Doe further argues that the School Board should be held liable for her injuries under § 1983. As in Title IX, municipalities may not be held liable for constitutional deprivations on the theory of respondeat superior. Denno v. Sch. Bd. of Volusia County, Fla., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, "municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80, 106 S. Ct. 1292, 1298 (1986). Therefore, a municipality may be held liable "only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276. In addition to identifying conduct attributable to the municipality, a plaintiff alleging

35

municipal liability under § 1983 must show that the "the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences." Davis, 233 F.3d at 1375–76 (internal quotation and citation omitted).

In this case, Doe does not point to an official School Board policy or a "custom or practice so pervasive and well-settled that it assumes the force of law." Instead she argues that the School Board is liable under § 1983 for the deprivation of her constitutional right to be free from sexual abuse due to the actions of Principal Scavella and Dr. Melita, "officials fairly deemed to represent government policy."[11] In other words, Doe's argument rests solely on the final policymaker theory of liability. According to Doe, Scavella's and Melita's actions reflect a School Board policy of ignoring standard investigative measures and presumptively resolving "he said, she said" complaints in the favor of the teacher.

The district court granted summary judgment because it concluded that the

---

[11] Before the district court, Doe also argued that the School Board could be subjected to municipal liability due to a pervasive and well-settled custom with the force of law. It appears that she has abandoned this argument on appeal. Regardless, Doe also cannot establish the School Board's § 1983 municipal liability on this basis. As a general rule, an "isolated incident, however unfortunate, does not demonstrate evidence of the County's 'persistent' or 'widespread' policy," McDowell v. Brown, 392 F.3d 1283, 1290–91 (11th Cir. 2004), and will not be considered "so pervasive as to be a custom or practice," Grech v. Clayton County, Ga., 335 F.3d 1326, 1330 n.6 (11th Cir. 2003). Even viewing Doe's allegations surrounding the K.F. and S.W. complaints collectively, they do not evidence a widespread or pervasive practice of disregarding student complaints.

36

School Board did not act with deliberate indifference in responding to the K.F. and S.W. complaints. We need not address deliberate indifference in this regard because Principal Scavella and Dr. Melita are not "officials fairly deemed to represent government policy" under our circuit's standard for § 1983 municipal liability. Therefore, Doe's § 1983 claim against the School Board fails as a matter of law, and the School Board is entitled to summary judgment. See United States v. $121,100.00 in U.S. Currency, 999 F.2d 1503, 1507 (11th Cir. 1993) ("This court will affirm a grant of summary judgment if it is correct for any reason.").

Municipal liability from a single action or decision may only "be deemed representative of the municipality" if "the acting official [is] imbued with final policymaking authority." Denno, 218 F.3d at 1276 (emphasis added). Determining the persons or bodies that have final policymaking authority for the defendant is a matter of state law to be determined by the trial judge and not the jury. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 738, 109 S. Ct. 2702, 2724 (1989); Owens v. Fulton County, 877 F.2d 947, 950-51 (11th Cir. 1989). Doe argues that Dr. Melita has final policymaking authority because the School Board delegated Dr. Melita the discretion to develop disciplinary guidelines and procedures for conducting personnel misconduct investigations. Doe also argues that Principal Scavella is a final policymaker for the School Board because he had the discretion

37

under these procedures to make the initial decision whether or not to investigate a student complaint. This authority, though representing a vesting of discretion in both Melita and Scavella, is insufficient to imbue them with final policymaking authority for purposes of § 1983 municipal liability.

We have strictly interpreted "Monell's policy or custom requirement to preclude § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997). In other words, final policymaking authority over a particular subject matter does not vest in an official whose decisions are "subject to meaningful administrative review." Id. at 1401. Compare Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996) (accepting concession that city police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager) with Martinez v. City of Opa-Locka, Fla., 971 F.2d 708, 714-15 (11th Cir. 1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review"). Doe has not shown that Melita's and Scavella's decisions are not subject to meaningful administrative review.

38

According to the School Board's "Event/Incident Process for Administrative Action," Melita, as a member of the Professional Standards Committee that reviews SIU investigations, makes "non-binding recommendations" of "probable cause" or "no probable cause" to the Superintendent of the School Board. Although Melita may have authority to make key decisions at various "decision points" in the administrative review process, the Superintendent has ultimate authority to veto or override the Committee's "no probable cause" finding or recommendation of a specific disciplinary action in the case of a "probable cause" finding. It is the Professional Standards Committee's "no probable cause" finding in K.F.'s case that Doe argues reflects the School Board's policy of deliberate indifference to "he said, she said" complaints. Because the Superintendent had the authority to veto this recommendation, this decision was "subject to meaningful administrative review" under Scala, and Melita was not a final policymaker that can subject the School Board to § 1983 municipal liability.

If Dr. Melita is not a final policymaker for the School Board, it follows a fortiori that Principal Scavella's decisions do not reflect final School Board policy under our circuit's § 1983 municipal liability standard. Doe contends that Scavella's decision not to pursue a formal investigation of the S.W. complaint reflected a School Board policy to favor a teacher's version of an alleged incident

39

of harassment. Scavella's authority to make a mere recommendation to a superior, which that superior is free to accept or reject, does not equate to the final authority to make School Board policy. Therefore, the School Board may not be subjected to municipal liability under § 1983 for the single acts of Principal Scavella.

C. Principal Scavella's Liability under § 1983

Doe's final argument on appeal is that Principal Scavella is individually liable for Doe's injuries under § 1983. Principal Scavella pled the defense of qualified immunity before the district court in response to this claim. Qualified immunity offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The parties do not dispute that at all times relevant to this appeal Scavella was acting in a discretionary capacity. When the court concludes that the defendant was engaged in a discretionary function, "the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). To satisfy this burden, the plaintiff must show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the

alleged violation." Id. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. _, 129 S. Ct. 808, 818 (2009). The district court did not address the second qualified immunity inquiry, holding that Scavella was entitled to summary judgment because Doe failed to establish that Scavella violated her constitutional rights, clearly established or not.

Section 1983 "provides every person with the right to sue those acting under color of state law for violations of federal constitutional and statutory provisions." Williams, 477 F.3d at 1299. Section 1983 does not create any substantive federal rights in and of itself; it is merely a vehicle to bring such suits. Id. Therefore, a § 1983 plaintiff must allege a specific federal right violated by the defendant. Here, Doe asserts that Scavella violated her constitutional right not to be sexually abused by a state official acting under color of law, a substantive due process right grounded in the Fourteenth Amendment.[12] Scavella appears to concede that Doe

[12] Doe does not allege Scavella's individual violation of Title IX. We have previously held that because Title IX expressly prohibits claims against individual school officials, permitting plaintiffs to use § 1983 to assert an individual Title IX claim "would permit an end run around Title IX's explicit language limiting liability to funding recipients" and is therefore prohibited. Williams, 477 F.3d at 1300.

41

has this right and that Hoever's sexual assault deprived her of that right. We assume so for the purposes of this appeal. See Hartley v. Parnell, 193 F.3d 1263, 1268 (11th Cir. 1999) (assuming for purposes of appeal that plaintiff had constitutional right not to be sexually abused by a state official). Scavella argues, and the district court held, however, that under the circumstances of this case, he cannot be held liable under § 1983 for Hoever's acts because he did not cause that deprivation. We agree.

Scavella did not personally participate in Hoever's sexual assault of Doe. Therefore to impose liability on Scavella for Hoever's constitutional violation, Doe must establish Scavella's liability in a supervisory capacity. See id. at 1269 (holding that a school district superintendent was not liable under § 1983 for the sexual abuse of a student at the hands of her teacher where plaintiff failed to show that he either personally participated in the abuse or that he was supervisorily liable for the teacher's violations). She cannot do so. "It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates" unless the "supervisor personally participates in the alleged constitutional violation" or "there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Id. This requisite causal connection can be established in the following circumstances: (1) when a

"history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" or (2) when a supervisor's "improper custom or policy results in deliberate indifference to constitutional rights." Id. (internal quotation and citation omitted). For a history of abuse to be sufficiently widespread to put a supervisor on notice, the abuse must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Id.

We agree with the district court that Doe cannot show the requisite causal connection between Scavella's actions and Hoever's sexual assault of Doe based on his notice of Hoever's "history of widespread abuse" or his "custom or policy" of deliberate indifference. "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Fla. Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998). First, Doe's conclusory assertion of a "history of widespread abuse" is clearly insufficient to put Scavella on notice of an ongoing constitutional deprivation. In evaluating the existence of widespread abuse, we have stated that "[a] few isolated instances of harassment will not suffice." Id. Cf. Valdes v. Crosby, 450 F.3d 1231, 1244 (11th Cir. 2006) (denying prison official's summary judgment motion where "inmate abuse at the hands of guards was not an isolated occurrence, but rather occurred with sufficient regularity as to demonstrate a history of widespread

43

abuse"). Unlike the two instances of sexual harassment alleged here, in Valdes there was evidence that the prison warden received at least thirteen complaints and inquiries in the year and a half preceding the plaintiff's son's death at the hands of prison guards, along with repeated warnings from the outgoing warden concerning the prison's problems with specific guards using excessive force on prisoners. Id. at 1241–43. Here, there is no basis for claiming that the two complaints against Hoever prior to Doe's sexual assault rose to the level of sexual harassment similarly "obvious, flagrant, rampant and of continued duration." Hartley, 193 F.3d at 1269.

Also insufficient is Doe's conclusory assertion of a custom or policy resulting in deliberate indifference to Doe's constitutional right to be free from sexual assault. Even if Scavella's decisions contributed to the fact question of the School Board's deliberate indifference and liability under Title IX, we cannot conclude that Scavella had a "policy in place prior to the sexual abuse which could have led [Hoever] to believe that sexual abuse of students was permitted." See id.

Accordingly, in the absence of evidence that Scavella personally participated in Doe's sexual assault, was on notice of a history of Hoever's widespread abuse of female students, or had a policy in place permitting such assaults, Doe cannot show that Scavella has supervisory liability for Hoever's deprivation of her constitutional

right to be free from sexual abuse.[13]  Although Scavella's acts and omissions reflect serious deficiencies that may be "clearly unreasonable in light of known circumstances" for purposes of Title IX liability, Doe has not established that these acts and omissions could subject Scavella to supervisory liability for the acts of his subordinates.  Therefore, the district court did not err in granting summary judgment to Scavella, and we need not reach the second step of our qualified immunity analysis—whether Scavella was on notice that his conduct violated clearly established constitutional rights at the time of the alleged violation.

## CONCLUSION

In conclusion, we REVERSE the district court's summary judgment in favor of the School Board on Doe's Title IX claims.  We AFFIRM the district court on all other rulings.

---

[13]    Doe's brief on appeal bases its assertion of Scavella's § 1983 liability solely on the theory of his supervisory liability.  Therefore, we need not, and do not, express opinion with respect to the possibility of Scavella's § 1983 liability based on a direct causal connection between his actions and omissions and Doe's sexual assault distinct from his potential supervisory liability.  Even if we considered such a possibility, Scavella would probably be entitled to qualified immunity.  Doe has not cited a single case showing that Scavella violated her clearly established Fourteenth Amendment rights by failing to vigorously investigate prior sexual misconduct allegations against Hoever.  Therefore, she has not satisfied her burden under the second step of our qualified immunity analysis.  See Williams, 477 F.3d at 1301 ("Williams has failed to present any cases that show the three defendants violated her clearly established equal protection rights by recruiting and admitting an individual like Cole.").  Although a plaintiff does not "have to show that the precise conduct in question has been held unlawful," for a federal right to be clearly established "its parameters 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 1300 (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).