[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13297

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 3, 2012
JOHN LEY
CLERK

D.C. Docket No. 3:09-cv-00142-WBH

J.F.K.,
M.C.K.,
as Next Friends, Parents and Natural
Guardians of O.K.K., a minor,

                                        Plaintiffs - Appellants,

versus

TROUP COUNTY SCHOOL DISTRICT,
ELIZABETH M. GADDY,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 3, 2012)

Before WILSON and MARTIN, Circuit Judges, and ALBRITTON,* District Judge.

ALBRITTON, District Judge:

_____

    * Honorable W. Harold Albritton, United States District Judge for the Middle District of
Alabama, sitting by designation.

## I. Introduction

J.F.K., et. al., appeal the district court's grant of Troup County School District's ("Troup") motion for summary judgment as to the Plaintiffs' sexual harassment claim brought pursuant to Title IX, 20 U.S.C. § 1681.[1]

The Appellants argue that the district court improperly applied a Title VII framework instead of the appropriate Title IX framework. Moreover, the Appellants argue that, although the district court offered a correct account of the facts, it erred by deciding that those facts, taken in a light most favorable to the Appellants, failed to create an issue of material fact as to the notice prong of the Title IX framework.

## II. Legal Standards

### A. Summary Judgment

This court reviews de novo a district court's grant of summary judgment, applying the same legal standards as the district court. *Tiara Condo Ass'ns, Inc. v. Marsh & McLennan Co., Inc.*, 607 F.3d 742 (11th Cir. 2010). This court will affirm if, after construing the evidence in the light most favorable to the non-movant, it finds that no genuine issue of material fact exists and the movant is

---

[1] The district court, having disposed of the only federal claim, declined to exercise supplemental jurisdiction over the related state law claims and dismissed them without prejudice.

entitled to judgment as a matter of law. *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1263-64 (11th Cir. 2010). Moreover, the "district court's decision may be affirmed if the result is correct, even if the court relied upon an incorrect ground or gave a wrong reason." *Id.* (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 n. 9 (11th Cir. 1998)).

## B. Title IX Standard

While we agree with the result of the district court's decision, we write to correct the standard applied by it.

The Supreme Court has recognized an implied right of action under Title IX, 20 U.S.C. § 1681, against a school district receiving federal education funding for sexual harassment of a student by a teacher *(see Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992)), although agency principles may not be used to impute liability for misconduct of its teacher (*see Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 283 (1998).

This court has explained that "the Supreme Court made plain that not all sexual harassment by teachers is sufficient to impose liability on a school district." *Doe v. School Bd. Of Broward County, Fla*, 604 F.3d 1248, 1254 (11th Cir. 2010) (citing *Gebser)*. In order to defeat summary judgment for such a claim, the plaintiff must satisfy three different inquiries. *Id.* The plaintiff must be able to 1)

identify a person with "authority to take corrective measures in response to actual notice of sexual harassment," 2) demonstrate that the notice was "sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment," and 3) show that the authority figure acted with deliberate indifference to the notice of harassment. *Id.* There is no dispute that the school's principal, Thomas Whatley ("Whatley"), is the appropriately identified authority figure who satisfies the first inquiry. The Appellants' first issue on appeal, then, is with the district court's articulation of the standard to be applied for the second inquiry, the substance of the actual notice.

The district court combined Title VII workplace discrimination standards with Title IX teacher-on-student harassment standards when it articulated the Appellants' burden as to inquiry two as follows:

> To summarize, Plaintiffs bear the burden of demonstrating that a reasonable person in Principal Whatley's position would conclude, based on what he had learned, that O.K.K. had been subject to unwelcome harassment by Gaddy that was either gender based or sexual in nature and that the harassment was so severe and pervasive that it threatened to create a hostile (or abusive) environment in an educational program or activity.

The district court's articulation of the standard improperly added two provisions. First, the district court improperly included an inquiry as to whether or not the harassment by Gaddy was "unwelcome." Such an inquiry has never been part of

4

the teacher-on-student harassment calculus. Second, the district court improperly included the requirement that the harassment be so severe and pervasive that it threatened to create a hostile environment in an educational program or activity. Again, as to teacher-on-student harassment, this has never been required. In fact, in *Sauls v. Pierce County School District*, 399 F.3d 1279 (11th Cir. 2005), this court noted that "[b]ecause this case involves teacher-on-student harassment, Appellants need not establish [the teacher's] misconduct was 'so severe, pervasive, and objectively offensive' that it denied [the plaintiff] equal access to educational programs or opportunities." *Id*. at 1284. The addition of these two factors created a standard more favorable to defendants than was envisioned by this court in *Broward*.

The Appellants argue, and this court agrees, that the simple articulation of the standard in *Broward* is sufficient. Simply put, the actual notice must be sufficient to alert the decision-maker to the possibility of sexual harassment by the teacher.

The district court's reliance on the wrong standard does not necessarily mandate that this court must now reverse its decision and remand the case. Because this court reviews a district court's grant of summary judgment de novo,

5

it will now consider whether the record facts establish that the Appellants have satisfied their burden to defeat summary judgment as to their Title IX claim.

## III. <u>Facts</u>[2]

The facts of this case stem from circumstances surrounding the sexual molestation of a twelve year old boy, O.K.K., by his forty-five year old seventh grade homeroom teacher, Elizabeth Gaddy ("Gaddy"). As a result of an independent investigation begun in November, 2008, Gaddy was charged criminally with child molestation, pled guilty on October 19, 2009, to committing at least five acts of oral sex on O.K.K. between May 20, 2008 and August 7, 2008, and was sentenced to prison. J.F.K., O.K.K.'s father, and M.C.K., O.K.K.'s mother, brought this Title IX claim on behalf of O.K.K., alleging that Troup is liable under Title IX because the actions taken by Principal Whatley failed to protect O.K.K. from Gaddy's assaults. The content of Whatley's knowledge as to the circumstances in this case will be determinative of Appellants' claims. Accordingly, the following facts, together with all justifiable inferences therefrom,

---

[2] This court's rendition of the facts after a full review of the record differs somewhat from the district court's account because the facts as set forth by the district court were not entirely supported by the record. The district court stated that "[f]or the purpose of summary judgment review, this Court relies entirely on Plaintiffs' factual narrative in their response to the Defendants' summary judgment motion to determine what Whatley knew." That narrative, however, included alleged facts that were not supported by the record.

construed in the light most favorable to the Plaintiffs, are limited to what the record shows Whatley knew about the situation giving rise to the sexual assaults of O.K.K.

During the middle of the 2007-2008 school year, roughly January 2008, Principal Whatley received a complaint from a parent, Michelle Scarborough, about Gaddy's conduct towards her son, one of Gaddy's seventh grade students. She explained to Whatley that, although she had given Gaddy permission to take her son with a group of students to go bowling in Columbus, her son did not return until after midnight. She also informed Whatley that Gaddy had continued to call the Scarborough home to ask if her son could go on other non-school related trips. Whatley was also shown a text message sent to the student by Gaddy encouraging the boy to skip his class and to come to her classroom so that he could see his girlfriend. Moreover, Mrs. Scarborough showed Whatley a note in which Gaddy encouraged the student to lie to his parents about skipping class. Gaddy and the student's parents met with Whatley to discuss this incident, and Gaddy explained that her daughter sent the text message to their son. The end result of this incident was that the parents asked for their son to be moved to another set of teachers, which was subsequently granted.

At another point in the 2007-2008 school year, another teacher at O.K.K.'s school, Ashley Summerlin, told Principal Whatley that O.K.K.'s phone number was in Gaddy's cell phone address book listed under the teacher's name, "Ashley Summerlin." Linda Smith ("Smith"), another seventh grade teacher at O.K.K.'s school, stated in her deposition that she told Summerlin about his name being in Gaddy's phone and that Gaddy's daughter was the one who showed her.

Some time after these incidents, likely in April 2008, Smith contacted J.F.K. about Gaddy's conduct during a spring break trip which Smith's family and Gaddy's family had taken together in early April 2008. J.F.K. testified in his deposition that Smith's conversation with him about the spring break trip concerned the fact that he needed to check O.K.K.'s phone because Gaddy had been constantly sending O.K.K. text messages. Smith testified to the same and explained that she told J.F.K. that she would not want a forty-five year old to have that much control over her twelve year old. She also testified that she told him that she did not think anything was going on except that Gaddy appeared to enjoy the attention. After receiving this information, J.F.K. spoke with Principal Whatley.

During the conversation with Whatley, J.F.K. expressed some of his concerns about Gaddy. He told Whatley that Gaddy was texting O.K.K. too much

and that gifts O.K.K. received for Christmas from the Gaddys were too expensive "even if [Gaddy's daughter] was his girlfriend." J.F.K. also told Whatley that his son was supposed to be a bus rider, and, therefore, he did not want Gaddy to continue taking him home after school. Given the proximity of the time between spring break and when J.F.K. told Whatley about his concerns, the court will infer that Whatley learned about Gaddy's behavior during spring break, including the fact that she constantly sent O.K.K. text messages[3]. J.F.K. testified that Whatley said he would look into it.

In late April 2008, Whatley contacted Superintendent Ed Smith about the complaints against Gaddy, including other complaints from the parents of the cheerleaders that Gaddy coached and presumably J.F.K.'s complaint to Whatley. A decision was made to search Gaddy's computer for evidence of any inappropriate behavior. The search was conducted by Dan Drake, a Troup employee, on May 2, 2008. Drake reported that there was no inappropriate content found on Gaddy's computer. Drake said that Gaddy's computer did have a photo of some students including one of a teenage boy, and there was evidence that Gaddy had been online shopping for a baseball uniform even though Gaddy

---

[3]Although J.F.K. does not testify to having informed Whatley about Gaddy having constantly sent text messages to O.K.K., this fact is included by the court in order to draw all justifiable inferences from other evidence in favor of the Plaintiffs-Appellants.

had no sons.  It is also uncontested that O.K.K. was a baseball player.  Nothing found during the search was saved, but this information was memorialized in an email sent to Whatley.

Smith also expressed her concerns to Whatley about Gaddy's behavior.  Although Smith explains that she spoke to Whatley a couple of weeks after the spring break trip, she clarifies that the conversation took place during the next to last week of school, which would have been in May.  That conversation began when Whatley called Smith to ask her if she would be willing to switch from her seventh grade social studies position to an eighth grade science position.  Smith agreed so quickly that it surprised Whatley.  When Whatley asked why she was so willing to move, Smith explained that Gaddy was texting the students too much.  Moreover, she told him that she was worried that Gaddy had grown too fond of O.K.K. and that she enjoyed the attention too much.  She also repeated what she told J.F.K. about Gaddy's spring break behavior.  Smith testified that she "truthfully did not think anything was going on at that point."

At the end of the 2007-2008 school year, on May 20, 2008, Gaddy had a group of students over to her house for an Honors Day pool party.  It is undisputed that O.K.K.'s mother, M.C.K., gave permission for O.K.K. to go to the pool party.  While at the pool party, O.K.K. was seen sitting close to Gaddy on the same towel

and spending time alone with her inside her house. Because of a cheerleading controversy that Gaddy later became involved with, Whatley was made aware during the summer of 2008 of Gaddy's conduct during the Honors Day pool party in addition to other complaints from cheerleading parents explained below.

Some of the complaints that Whatley was made aware of included complaints by several parents that Gaddy was excessively involved in their children's lives, that she verbally abused the female students by calling them "sluts and whores," and that she referred to one girl that O.K.K. liked as an "ugly Asian." One parent, Kristie Thompson, made a complaint to Whatley that Gaddy was possessive of O.K.K., and that the only girl that was allowed to "like" O.K.K. was Gaddy's daughter. Another parent, Mrs. Berryhill, told Whatley in August of 2008 that she had gone to the Gaddys' home and had seen Gaddy and O.K.K. on a sofa with their bodies touching and a blanket covering their legs. When Whatley confronted Gaddy about these accusations, Gaddy always provided a plausible explanation. As to the sofa incident, Gaddy explained that her husband was on the same sofa and that her dog had urinated on the sofa earlier, thus limiting available seating space.

Also during July 2008, Whatley met with cheerleader parents to discuss all the issues raised about Gaddy's conduct towards students. There is no evidence that Whatley did anything about the O.K.K. situation during this meeting.

Smith testified that at the end of July, a couple of weeks before school was supposed to start, Whatley called both Smith and Gaddy into his office to discuss some allegations made by Gaddy about Smith. During that meeting, Smith explained that Gaddy was angry with her because she told O.K.K.'s family that O.K.K. had been coming over to the Gaddys' residence without their permission. She also explained that Gaddy was upset about how, according to Gaddy, Smith, as a co-coach of the cheerleaders, had told false things to some of the cheerleaders and their parents. Gaddy explained that she could not work on cheerleading anymore with Smith, but Whatley kept them both on as coaches.

J.F.K. took both O.K.K. and another of his sons to school to register just before the start of the 2008-2009 school year. While at the school, he met with Whatley to discuss the Gaddy situation. He explained that this was O.K.K.'s eighth grade year, and he did not want Gaddy to be involved with O.K.K. He wanted there to be no interaction between Gaddy and O.K.K., and Whatley told him that he would look into it. The Appellants argue in their brief that Whatley never did anything to actively correct the problem. Whatley's deposition,

12

however, explains that he banned Gaddy from the eighth grade hall, and this is not disputed.

After the 2008-2009 school year commenced, Gaddy continued to contact O.K.K. through calls, emails, and letters even though he was no longer in any of her classes. Seeing that Gaddy was continuing to make contact with O.K.K., O.K.K.'s parents, J.F.K. and M.C.K., arranged to meet with Whatley in the school's conference room around late October 2008. At this meeting, the third between Whatley and J.F.K. in six months, O.K.K.'s parents told Whatley about Gaddy's continued contact with O.K.K. despite her not being his teacher anymore. At this time, O.K.K.'s parents reiterated that they did not want Gaddy around O.K.K. anymore, and Whatley explained that he had banned Gaddy from the eighth grade hall after his last meeting with J.F.K. The Appellants conceded that Whatley did ban Gaddy from the eighth grade hall, but argue that he did so because of her involvement in the cheerleader controversy and not because of his meeting with J.F.K. in August of 2008.

Also during that October 2008 meeting with Whatley, Whatley asked O.K.K.'s parents if they thought anything was going on between O.K.K. and Gaddy. M.C.K. testified that they told Whatley that they did not think anything was going on. However, M.C.K.'s undisputed testimony is that before the October

13

meeting she knew, or at least had a mother's intuition, that something was going on between O.K.K. and Gaddy. Again, neither parent told Whatley during the October 2008 meeting, or any other meeting for that matter, that they suspected that anything of a sexual nature was going on between O.K.K. and Gaddy.

The last incident that Whatley was told about relating to O.K.K. and Gaddy was that on one occasion in October 2008, which was after Gaddy had been banned from the eighth grade hall, Gaddy went down that hall looking for O.K.K. According to one of the teachers at the school, O.K.K. saw Gaddy coming and hid from her in the boys' restroom.

## IV. Discussion

The first step for the Appellants to defeat summary judgment as to their Title IX claim is to identify a person with the authority to take corrective measures in response to actual notice of sexual harassment. Since it is not contested that Principal Whatley fits this description, the Appellants have satisfied their burden as to the first factor. With this factor satisfied, the court will turn to the notice inquiry.

There are different ways by which such actual notice may be satisfied. One, of course, would be if it were shown that Whatley had knowledge that Gaddy was actually sexually harassing O.K.K. That was not the case. A second way would

14

be to show that Whatley had actual knowledge of sexual harassment by Gaddy of students other than O.K.K. "sufficient to alert [Whatley] of the possibility of [O.K.K.'s sexual] harassment" by Gaddy. *Broward*, 604 F.3d at 1254. Also, as we said in *Broward*, under some circumstances "lesser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter." *Id.* at 1258.

From the record, it appears clear that Whatley was never put on notice of any single act, or combination of acts, of actual sexual harassment by Gaddy of other students of the type to which O.K.K. was subjected. Instead, the Appellants argue ithe theory that reports of lesser levels of inappropriate conduct can be enough to put the school official on sufficient notice as required by Title IX. The Appellants rely on the facts in our *Broward* case to make this argument.

The teacher in *Broward* sexually assaulted the plaintiff, Doe. *Id.* at 1250 n. 1. While this was the first incident of sexual harassment from the teacher against Doe, there had been two highly similar complaints lodged against the same teacher by other female students directly to the principal. 604 F.3d at 1250-53. The complaints alleged, *inter alia*, that the male teacher put his hands on the two non-party victims, lifted their shirts up to expose their stomachs or told them to do it, tried to blackmail one of the victims into having sexual intercourse with him, and

made other sexually suggestive comments about each non-party victim's physique. *Id*. The principal conducted investigations as to each complaint, but he only implemented minimal corrective measures. *Id.* The victim in *Broward* relied on the two other sexual harassment complaints to satisfy the actual notice requirement for her Title IX claim against her principal and school board. *Id.* at 1257. The *Broward* district court had granted summary judgment for the school board and held that the other two reports were not enough to satisfy the Title IX notice requirement, but this court disagreed and reversed. *Id*. at 1257, 1267. This court found that the two prior complaints were enough to satisfy Doe's burden of raising a material fact about actual notice because "[the two] complaints, when viewed collectively, provided actual notice to [the Principal] of a pattern of sexual harassment and a series of related allegations occurring over a period of nine months in [the teacher's] math classroom." *Id.* at 1059.

The Appellants attempt to analogize Gaddy's behavior to that of the teacher in *Broward*. Like the teacher from *Broward*, Gaddy had been the subject of a complaint involving another male student who received text messages and letters from Gaddy encouraging the student to skip class to meet up with his girlfriend in Gaddy's classroom and to lie to his parents about skipping class. The key difference is that Gaddy's conduct towards this other student did not involve the

16

type of sexual or gender based harassment required in a Title IX claim. The complaints against the teacher in *Broward* concerned behavior that almost certainly qualifies as Title IX sexual harassment, and both complaints were reported to the *Broward* principal before Doe was assaulted. The nature of the complaints and the fact that they took place before the assault on Doe was sufficient to create an issue of material fact as to whether notice was sufficient.

Looking to the rest of the facts of the present case, Whatley knew about complaints from teachers and parents that Gaddy was constantly sending O.K.K., and other students, text messages. He knew that Gaddy bought Christmas gifts for O.K.K. that J.F.K. thought were inappropriately expensive, and that Gaddy took O.K.K. home in her car against J.F.K.'s wishes. He knew that Gaddy had been shopping for a baseball uniform despite having no sons. He knew that Gaddy and O.K.K. had been seen sharing a towel at a pool party and spending time alone inside the house, and later sharing a blanket with their legs touching on Gaddy's sofa. He also knew that Smith thought that Gaddy was too fond of O.K.K. and that another student's parent worried that Gaddy was "possessive" of O.K.K. by not letting any other girl "like" O.K.K. but her daughter. He knew that several parents, including those of cheerleaders, were complaining of Gaddy's excessive involvement in their children's lives and that Gaddy called some female students

17

inappropriate and offensive names.  He also knew that O.K.K.'s parents wanted Gaddy to stay away from him, although they told him they did not believe anything was going on between O.K.K. and Gaddy.  It appears clear to this court that Whatley knew Gaddy's conduct was inappropriate, devoid of professionalism, and reeked of immaturity; however, despite this, her known conduct was not of the same type of conduct of a sexual nature as the teacher in *Broward*.

Another instructive case is *Davis v. DeKalb County School District*, 233 F.3d 1367, 1373 (11th Cir. 2000), in which this court found that a prior complaint about the teacher-abuser by a non-party victim was not enough to put the principal and school board on notice.  The non-party student's complaint alleged touching on that prior student's bottom during a football game in which the teacher was the quarterback and the student was the center.  The complaint also alleged that at the water fountain after the football game the teacher walked inappropriately close to the student.  *Id*.  It is true that Whatley did have knowledge of another non-party student's complaint in the form of Mrs. Scarborough's complaint to Whatley about Gaddy encouraging her son to skip class to meet up with his girlfriend in Gaddy's classroom and to lie to his parents about skipping class.  However, as in *Davis*, this conduct contains no sexual harassment or gender discrimination component,

and, therefore, was not enough to create a question of fact as to whether Whatley had sufficient notice.

Ultimately, a comparison of Gaddy's conduct, including the leg-to-leg contact under the blanket, buying of expensive gifts, extensive phone contact, "possessiveness" of O.K.K., and other conduct mentioned above, with the conduct of the teachers in *Davis* and *Broward* leads this court to the conclusion that Gaddy's conduct was more in line with that of the teacher in *Davis*. Like the principal in that case, Whatley's knowledge was not enough to put him on actual notice that there was a risk of sexual harassment against O.K.K. by Gaddy. This is even more clear in light of the fact that Whatley knew that Gaddy's daughter and O.K.K. were friends, and, according to the briefs, dated for a while; that O.K.K. was often a guest of the Gaddy family; and that O.K.K.'s parents told Whatley that they did not suspect anything was going on.

Accordingly, after considering the factual record and drawing all justifiable inferences in favor of the Appellants, this court finds that the information of which Whatley had knowledge is not enough to create a genuine issue of material fact as to whether Whatley had actual notice sufficient to alert him to the possibility of sexual harassment of this twelve year old boy by his forty-five year old female teacher.

## V. Conclusion

Although for different reasons than the district court, the district court's grant of summary judgment in favor of the Appellee-Defendants is

**AFFIRMED.**