Tonia HAWKINS, et al., Plaintiffs–Appellants,

v.

SARASOTA COUNTY SCHOOL BOARD, Defendant–Appellee.

No. 02–10990.

United States Court of Appeals, Eleventh Circuit.

Feb. 28, 2003.

**1280**

Alan E. Tannenbaum, Levin, Tannenbaum, Wolff, Band, Gates & Pugh, Sarasota, FL, for Plaintiffs–Appellants.

Arthur S. Hardy, Matthews, Hutton & Eastmore, Sarasota, FL, for Defendant–Appellee.

Before BLACK and MARCUS, Circuit Judges, and MIDDLEBROOKS*, District Judge.

MIDDLEBROOKS, District Judge:

I

The Appellants, parents and guardians of three female students, brought suit against the Sarasota County School Board (the "Board") alleging that their children had been the victims of sexual harassment by another student in the girls' second grade class. The complaint includes a claim under Title IX of the Education Amendments of 1972 ("Title IX"), 86 Stat. as amended, 20 U.S.C. § 1681 *et seq.*, as well as state common law negligence claims. The district court granted summary judgment in favor of the Board. Appellants argue that disputed issues of fact remain on all issues determined by the district court and that the granting of summary judgment was inappropriate.[1]

This case presents our first opportunity to apply principles established by the Supreme Court governing a private damages action brought pursuant to Title IX based on student-on-student sexual harassment. *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). As we do so we are mindful of the constraints of federalism and the appropriate limits upon intrusion by the federal courts into the classroom.

We review de novo a district court's grant of summary judgment, applying the same legal standards as the trial court. *See Chapman v. AI Transport,* 229 F.3d 1012, 1023·(11th Cir.2000). To this end, summary judgment should be upheld only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Jones v. Firestone Tire and Rubber Co.,* 977 F.2d 527, 535 (11th Cir.1992). We are required to resolve all reasonable inferences and

---

* Honorable Donald M. Middlebrooks, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. At oral argument, Appellants conceded on the issue of negligence, stating that under Florida case law, in order to succeed based on Florida's "impact rule," the emotional distress suffered by a victim must stem from physical injuries suffered in an impact. Appellants conceded that no such injury or impact took place in this matter, and that the Board did not intentionally act to create an environment in which the girls were caused severe suffering. As such, Appellants limited their arguments to their Title IX claim.

facts in the light most favorable to the non-moving party. *Watkins v. Ford Motor Co.,* 190 F.3d 1213, 1216 (11th Cir. 1999). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the summary judgment cannot be sustained. *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988).

## II

### A

Jane Doe I and Jane Doe II were eight-year-old girls enrolled in Barbara Cyphers's second grade class at North Toledo Blade Elementary School ("North Toledo") at the start of the 1998–1999 school year. Jane Doe III joined the class in January, 1999. During that year, William T. Coulson was the principal of North Toledo.

According to the complaint, John Doe, also eight years old, was expelled from a private school for striking a female student. After his expulsion, he was enrolled by his parents at Toledo Blade. He was placed in Cyphers's class in November, 1998. Upon joining Cyphers's class, John Doe allegedly began a pattern of harassing conduct toward the girls.

The three girls testified that not long after he joined the class, John Doe would cross his hands, gesture to his genitals, and tell Jane Doe I, Jane Doe II, and Jane Doe III to "suck it." [2] In the lunchroom, he would hold two fingers up. One of the girls testified that although she did not know what this meant, she was told by other children that it meant "meet me in bed in two seconds." [3] In the lunchroom, he also said that he wanted to "suck [the girls'] breasts till the milk came out," [4] that he wanted [the girls] to "suck the juice from his penis," and that "he wanted [the girls] to have sex with him." On other occasions, he referred to one or all of the girls as "sexy baby" and stated that "you have a bun, and I have a hot dog, and I want to eat them both." At the playground, he would chase the girls and try (sometimes successfully) to touch them on their chests, and (unsuccessfully) to kiss them. At the bus stop, he also would try to grab Jane Doe III and look up her skirt. He would also jump onto her and rub his body on hers. The girls stated that this conduct took place over a period of several months.

While none of the girls' grades appeared to suffer, two of them said that on four or five occasions they faked being sick in order not to go to school. Their parents testified that they cried more frequently, appeared anxious, and were reluctant to go to school.

### B

While a number of school personnel had received complaints about John Doe, none stated that they had seen him engage in behavior that was overtly sexual. Kathy Martin, a staff member in Toledo Blade's lunchroom, testified that while she

2. While John Doe's father stated that John Doe was a "clown" who "want[ed] to get all the attention," he testified that by using vulgar expressions, John Doe was trying to mimic older children that he had spent time with at Little League. According to John Doe's father, "[o]ne of the little boys on the baseball field ... would push his hip out towards [John Doe] and say 'suck this.'"

3. Jane Doe III testified that a number of boys in the class were familiar with and used this

gesture. In addition, the girls testified that they did not know the meaning of a number of terms and gestures that John Doe used. Jane Doe II testified that at the time, she did not know what it meant to have sex, but only had an idea that it was something "nasty." Jane Doe III testified that before being harassed by John Doe, she did not know the meanings of the words "dick" and "penis."

4. Jane Doe III stated that this conduct took place in front of both her and Jane Doe II.

had witnessed John Doe running indoors, not sitting, exhibiting bad table manners, and hitting another student, she could not recall an instance of a female student specifically reporting his behavior. The children's computer, life skills, and art teachers all gave consistent reports about John Doe's bad behavior.

The children spent the most time during the school day in Cyphers' class. Within a week of John Doe's joining the class, Cyphers began to receive complaints that he was being "annoying" to the other children, tapping his pencil, and distracting them from doing their work. Periodically, she received complaints that he had pushed other children at the playground. Such complaints would come from both boys and girls alike.

Cyphers testified that some time near the end of the school year, either at the end of April or the beginning of May, three girls—Jane Doe II and two girls not involved with this suit—approached Cyphers and told her that John Doe was being "disgusting." Cyphers stated that John Doe had been saying "I love you" and "will you marry me" to the girls, and she referred to the conduct as "natural things in second grade. You know, things they hear at home." She stated that it was not until she had spoken with Jane Doe III's mother in May, 1999 that she had been informed of any of the explicit things John Doe had said or done.

The three girls, however, testified that they had been quite persistent in describing John Doe's behavior to Cyphers, and that Cyphers repeatedly ignored their reports. Jane Doe I stated that she told Cyphers that John Doe was being "nasty"

not long after he first exhibited harassing behavior. She claimed that she was no more explicit because she did not want to get in trouble. She stated that she told Cyphers a number of times about John Doe's conduct, but Cyphers always responded that she would take care of it later. Jane Doe II stated that, early in the year, she told Cyphers that John Doe was being "disgusting" and asked to have her seat moved. She also claims to have told Cyphers on a number of occasions when the children were playing outside that John Doe was being "nasty" and asked Cyphers to do something about it.

According to Jane Doe III, one day after she arrived at Toledo Blade, she told Cyphers that John Doe had been following her. Jane Doe III said that during recess that day, when John Doe touched her in the groin, she told Cyphers that John Doe was being "gross." She was not more explicit because she did not feel comfortable enough with Cyphers on only her second day. She stated that on another occasion, she told Cyphers that John Doe had told her to "suck his dick." She stated that Cyphers immediately told her to sit down and did nothing else. Jane Doe III testified that she spoke to Cyphers (and was rather explicit) about John Doe virtually every day.

## C

Shortly after May 5, 1999, Jane Doe III's mother contacted both Coulson and Cyphers. Cyphers told her that the school was aware of John Doe's behavior, and that the school was working with John Doe's parents to try to resolve his behavior problems.[5] After Jane Doe III and her

---

**5.** A number of individuals responsible for supervising John Doe had disciplined him at various points during the year. He was placed at the "detention table" in the lunch room a number of times when he misbehaved. On one occasion, John Doe's computer teacher notified Cyphers of his misbehav-

ior, who in turn notified John Doe's parents. After he had bothered other students in Cyphers' class, John Doe was moved away from the other students, to a seat facing the wall. When he misbehaved at recess, he was similarly removed from the other children. Some

mother discussed the allegations of harassment with Coulson, he contacted John Zoretich, Director of Sarasota County Elementary Schools, and was told to "follow through" on the allegations. After meeting with Jane Doe III and her mother, Coulson suspended John Doe for all of the following week.[6] For the week after he returned, John Doe was given an "in-school" suspension, where he sat at a desk in Coulson's office for much of the day, and had escorts take him to the lunchroom and bus at the end of the day. Coulson directed Cyphers to make sure John Doe and Jane Doe III were separated "at all times."

Some time during the first week of June, 1999, Coulson received a fax from the attorney representing the guardians of the three girls, notifying him that John Doe's conduct had recurred. Coulson then suspended John Doe for the remainder of the school year. During the last week of the school year, a guidance counselor conducted a program for the students on appropriate and inappropriate "touching." After the suspension, Coulson recommended to John Doe's father that John Doe seek social counseling. John Doe's return to Toledo Blade was contingent upon his being given counseling. Through the summer, he participated in a family services counseling program. At the beginning of the following school term, the school saw to it that John Doe and Jane Doe III were not placed in the same classroom. In third grade, for the time he was at Toledo Blade, John Doe was given an adult escort from the time he got on campus until the time he left at the end of the day. Though John Doe and Jane Doe III had brief interactions in third grade before he left for another school, Jane Doe III reported no further instances of harassment.

### III

Title IX provides that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681 (1984). Our analysis is controlled by the Supreme Court's recent decision in *Davis*, which, in turn, is grounded upon the Court's decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In *Gebser*, Justice O'Connor, in a 5–4 decision, held that a school district cannot be liable for sexual harassment of a student by one of the district's teachers "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to the teacher's misconduct." *Gebser*, 524 U.S. at 277, 118 S.Ct. at 1993. In *Davis*, Justice O'Connor, again in a 5–4 decision, but this time joined by the four *Gebser* dissenters, held that "in certain limited circumstances," deliberate indifference to known acts of harassment—the misconduct identified in *Gebser*—amounts to an intentional violation of Title IX capable of supporting a private damages action even when the harasser is

---

time in spring, 1999, Cyphers, John Doe's father, and John Doe's art teacher had a meeting to discuss his behavior. He was also occasionally placed at the "time out" desk in his life skills class.

**6.** Some time before the school had instituted disciplinary proceedings against John Doe,

the school had conducted a "peer mediation" involving John Doe and another girl over comments John Doe had made. Such mediations were conducted by trained fifth graders, who would assist younger students in talking through their disputes.

a student rather than a teacher. *Davis,* 526 U.S. at 643, 119 S.Ct. at 1671. In order to determine the scope of the "limited circumstances" it is necessary to scrutinize both opinions.

In *Gebser,* the Court examined the text and purpose of Title IX in order to shape the judicially implied private right of action. Since Congress had expressly directed that an administrative agency could not initiate enforcement proceedings under Title IX until it "ha[d] advised the appropriate person or persons of the failure to comply with the requirement and ha[d] determined that compliance [could not] be secured by voluntary means," 20 U.S.C. § 1682, the Court reasoned that a judicially implied system of enforcement should not impose liability without consideration of a recipient's knowledge or its corrective actions. *Gebser,* 524 U.S. at 289, 118 S.Ct. at 1999. Therefore, Title IX liability could not rest on principles of vicarious liability or constructive notice. The Court thus held that in cases that do not involve official policy of the recipient entity, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290, 118 S.Ct. at 1999.

■ Moreover, said the Court, not only is actual notice required, but the premise of Title IX "is an official decision by the recipient not to remedy the violation." *Id.* Concerned that a lower standard would result in damages not for the funding recipient's own official decision, but for its employees' independent actions, the Court employed the "deliberate indifference" approach already used to establish a municipality's liability for failing to prevent a deprivation of federal rights under 42 U.S.C. § 1983. *See Gebser,* 524 U.S. at

290–91, 118 S.Ct. at 1999 (citing *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) and *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Under Title IX, recipients can only be held liable in a private damages action where their own deliberate indifference effectively causes the discrimination. *Gebser,* 524 U.S. at 292–93, 118 S.Ct. at 2000. In *Gebser,* the Court held that a teacher's sexual relationship with his eighth grade student, while reprehensible and undermining the basic purposes of the educational system, was not independent misconduct attributable to the school district that employed him since Title IX was "designed primarily to prevent recipients of federal financial assistance from using funds in a discriminatory manner." *Id.* at 292, 118 S.Ct. at 2000.

In *Davis,* the Supreme Court reversed an *en banc* decision of this Court which had affirmed dismissal of a Title IX claim based on student-on-student sexual harassment. In *Davis* the plaintiff had alleged that she was sexually harassed for several months by another fifth grade student, that the principal and two teachers failed to respond, that the school board had not instructed the personnel on how to respond to peer sexual harassment and had not adopted a policy on the issue, that her grades had allegedly dropped, and that she had threatened suicide.

The *Davis* Court held that these allegations were sufficient to state a claim under Title IX, concluding that

> funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the

educational opportunities or benefits provided by the school.

*Davis,* 526 U.S. at 650, 119 S.Ct. at 1675.

■ After *Davis,* then, a court confronted with a private damages action under Title IX must ask two questions: (1) was the school board deliberately indifferent to sexual harassment about which it had actual knowledge; and (2) was the sexual harassment so severe, pervasive, and objectively offensive that it can be said to have systemically deprived the victims of access to the educational opportunities of the school?

### A

To answer the first question, it is necessary to examine who, within the school system, must have notice of the harassment for the school board to be considered to have actual knowledge. *Gebser* held that a Title IX damages remedy would not lie unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination...." *Gebser,* 524 U.S. at 290, 118 S.Ct. at 1999. In that case, the Court pointed out that the only official alleged to have had notice of the teacher's misconduct was the high school principal. However, the principal's only "notice" was a report about inappropriate comments being made in class. The Court deemed this insufficient to alert the principal to the possibility that the teacher was involved in a sexual relationship with the student. The Court also noted that the principal did not report the complaint to the superintendent. Without the necessary actual notice, the Court held that the school board could not be held liable.

The *Davis* court did not explicitly discuss the type of school employee who must know about harassment by a fellow student before it is actionable, but held that notice of harassment to the principal and two teachers was deemed sufficient to support a cause of action under Title IX. In dissent, however, Justice Kennedy found the *Davis* majority's failure to describe explicitly who must have notice to be "telling." *Davis,* 526 U.S. at 679, 119 S.Ct. at 1688 (Kennedy, J., dissenting). He suggested that in most cases of student misbehavior it is the teacher, at least in the first instance, who has authority to punish the offender and remedy the harassment. Application of the *Gebser* standard, he warned, might lead to the anomalous result that while a school district would not be liable for a teacher's sexual harassment of a student without notice to at least the principal, it could be held liable for a teacher's failure to remedy peer harassment. This could lead to the absurd conclusion, said Justice Kennedy, that the threshold of liability for a school system might be lower where the harasser was a student than where a teacher engaged in sexual harassment. *Id.* at 679, 119 S.Ct. at 1689.

In this case, the district judge held that the complaints of Jane Doe I and Jane Doe II were too general to provide notice of the sexual nature of John Doe's harassment. With respect to Jane Doe III, however, accepting the truth of the deposition testimony that she expressly and repeatedly told her classroom teacher about the specifics of the behavior, the district judge felt that notice to the teacher constituted actual knowledge on the part of the school board. He then found that the teacher and other school personnel were not deliberately indifferent to the harassment and that the girls were not deprived of access to the educational opportunities or benefits provided by the school.

In arriving at his decision concerning notice, the district judge relied upon language from the Tenth Circuit's opinion in *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238 (10th Cir.1999). The com-

plaint in *Murrell* alleged that the school principal had actual notice of the harassment and applying *Davis*, the Tenth Circuit stated that it found little room for doubt that the principal's knowledge could be charged to the school district. *Murrell*, 186 F.3d at 1247.

The court then noted that the complaint also alleged that the girl's teachers had actual knowledge of the harassment and not only refused to remedy it but participated in concealing it by telling her not to tell her mother and failing to tell the girl's mother themselves. The court stated that "[i]t is possible that these teachers would also meet the definition of 'appropriate persons' for the purposes of Title IX liability if they exercised control over the harasser and the context in which the harassment occurred." *Id.* at 1248. As it was reviewing the granting of a motion to dismiss, the Tenth Circuit accepted as true the allegation that the teachers were invested with the authority to halt the sexually assaultive behavior.

The dissent in *Murrell* viewed the majority's analysis as "unnecessarily broad" inasmuch as it implied that a single teacher's inaction might in some circumstances be enough to trigger Title IX liability. *Id.* at 1252 (Anderson, J., dissenting). Pointing out that a single teacher's misconduct was not enough to subject a recipient to liability in *Gebser*, the *Murrell* dissent considered it "an open question after *Davis* whether a single teacher's indifference is ever sufficient for recipient liability...." *Id.*

We likewise consider the issue of whether notice to a teacher constitutes actual knowledge on the part of a school board to be open. In order to answer the question, it would be necessary to examine how Florida organizes its public schools, the authority and responsibility granted by state law to administrators and teachers, the school district's discrimination policies and procedures, and the facts and circumstances of the particular case. Moreover, Florida has enacted the "Florida Educational Equity Act," FLA. STAT. ANN. 228.2001 (2002)[7] which is patterned after Title IX and prohibits discrimination based on race, national origin, sex, handicap, or marital status against any student or employee in the state system of public education. We are uncertain how its procedures may affect the notice analysis and how its existence might impact upon any finding of deliberate indifference.[8]

Moreover, in the context of student peer harassment, delineation of the notice re-

---

**7.** 2002 Fla. Laws ch. 2002–387 § 1058 repealed Part I of chapter 243 and chs. 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 239, 240, 241, 242, 244, and 246 of the Florida Statutes effective January 7, 2003. These sections constituted much of the "Florida School Code." The Florida School Code replaced by the revised and renamed "Florida K–20 Education Code." *See* FLA STAT ANN. chs. 1000–1013 (2003). The Florida Educational Equity Act was revised and renumbered § 1000.05.

**8.** The Act authorizes the State Board of Education to adopt rules and directs the Office of Equal Educational Opportunity of the Department of Education to conduct reviews to determine compliance with the Act and upon finding the agency is not in compliance, to notify the agency of the steps necessary for compliance. Pursuant to this authority, FLA ADMIN. CODE ANN. r. 6A–19.010 (2002) also directs each school district to submit a plan of implementation which must include the policy of nondiscrimination adopted by the board. The policy must include the name of the equity coordinator designed to coordinate compliance and must include grievance and complaint procedures available to all students and their parents. In *Gebser*, Justice Ginsburg, dissenting on behalf of three of the justices, suggested that the Court recognize as an affirmative defense to a Title IX charge of sexual harassment an effective policy for reporting and redressing such conduct. *Gebser*, 524 U.S. at 307, 118 S.Ct. at 2007.

quirement may prove to be difficult. With respect to harassment by teachers or staff, application of the Supreme Court's requirement of actual notice to an official with authority to address the discrimination and to institute corrective measures results in a limited and readily identifiable number of school administrators. However, a much broader number of administrators and employees could conceivably exercise at least some control over student behavior.[9]

These issues were not fully briefed or argued on appeal. The notice issue was raised only in a footnote in appellee's brief and appellants did not respond to it in their reply. It would be helpful to have the issues fully presented in an adversarial setting. This is particularly true where

there is little guidance from Congress, the Supreme Court, or the other Courts of Appeal. It is always difficult to determine Congress' intent when dealing with the elements of an implied cause of action, because the text and legislative history of a statute that does not expressly create a cause of action is typically silent as to the parameters of the action. In *Davis*, the Supreme Court majority did not directly address who must have notice even in the face of Justice Kennedy's dissent, and there is scant persuasive authority from the other circuits.[10]

The deliberate indifference issue is intertwined with the question of notice since whether the Board's actions were clearly unreasonable must be measured by what was known.[11] We have therefore decided

9. We note that subsequent to the Supreme Court's decisions in *Gebser* and *Davis*, the Office of Civil Rights of the U.S. Department of Education ("OCR"), the agency responsible for regulatory enforcement of Title IX has provided guidance for schools in recognizing and responding to sexual harassment of students. *See* Revised Sexual Harassment Guidance: Sexual Harassment of Students by School Employees, Other Students, or Third Parties, 66 Fed.Reg. 5,512 (Jan. 19, 2001), *available at* http://www.ed.gov/ocr/shguide. While recognizing the requirement of actual notice for private actions seeking money damages, OCR continues to assert that for regulatory purposes and for private actions for injunctive and other equitable relief, a school has notice if a responsible employee knew, or in the exercise of care should have known of the harassment. According to OCR, a responsible employee for purposes of notice includes "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." OCR considers the term "responsible employee" to include "a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs." *See also*

Request for Comments, 65 FR 66,092 (Nov. 2, 2000).

10. In the context of teacher-on-student sexual harassment, the Fifth Circuit in *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393 (5th Cir.1996) has held that a fellow teacher does not have the requisite authority to be an appropriate person for notice under Title IX. The Court stated:

[w]e need not decide, and thus leave for another day, the question of whether the appropriate (or lowest level) management level person to be notified is a Title IX coordinator, vice principal, principal or superintendent, or school board member.

*Canutillo*, 101 F.3d at 401 (internal citation omitted).

Moreover, in another teacher-on-student harassment case, *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163 (3d Cir.2002), the Third Circuit found that a trial judge erred in failing to instruct the jury that a school guidance counselor could not be an "appropriate person" for purposes of actual notice to the school district.

11. In *Davis*, the Court explained that a funding recipient can be deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is

that the better course is to refrain from answering the notice and deliberate indifference issues involved in the first question and to rest our opinion on the denial of access issue.

## B

The next question we must ask is: was the sexual harassment so severe, pervasive, and objectively offensive that it can be said to have systematically deprived the victims of access to the educational opportunities of the school?

In the context of student-on-student harassment, damages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies its victims equal access to education. *Davis*, 526 U.S. at 650, 119 S.Ct. at 1675. The behavior must be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity.

Whether gender oriented conduct rises to the level of actionable harassment often depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim, and the number of individuals involved. *Id.* at 651, 119 S.Ct. at 1675; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 83, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).

■ When interacting with each other, children often exhibit behavior that would be wholly unacceptable between adults. "The real world of school discipline is a rough-and-tumble place where students practice newly learned vulgarities, erupt with anger, tease and embarrass each other, share offensive notes, flirt, push and shove in the halls, grab and offend." Brief of Amici Curiae National School Boards Ass'n et al. at 11, *Davis*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (No. 97–843). In the school setting, students often engage in insults, teasing, shoving, and gender-specific conduct that is upsetting to the student subjected to it. Damages are not available for simple acts of teasing and mere name-calling among school children even where these comments target differences in gender. *Davis*, 526 U.S. at 651–52, 119 S.Ct. at 1675.

■ In this case, the conduct alleged was persistent, continuing to occur on a frequent basis for several months. It included sexually explicit and vulgar language and acts of objectively offensive touching. Although neither the perpetrator nor the victims fully understood its ramifications, the harassment was unwelcome and intimidating.

Even assuming that the behavior was severe, pervasive, and objectively offensive, it was not *so* severe, pervasive, and objectively offensive that it had the systemic effect of denying the girls equal access to education. As the Supreme Court stated, the most obvious example of student-on-student harassment capable of denying a victim access to education and thus triggering a damages claim would involve overt, physical denial of access to school resources. Examples given by the Court included circumstances where male students physically threatened female students daily, thereby successfully preventing them from using a computer lab or athletic field. *Davis*, 526 U.S. at 650–51,

"clearly unreasonable" in light of the known circumstances. *Davis*, 526 U.S. at 648, 119 S.Ct. at 1674.

This is not a mere "reasonableness" standard or a failure to use reasonable care standard similar to negligence. *Id.* at 649, 119

S.Ct. at 1674. "In an appropriate case," emphasized the Court, "there is no reason why courts, on a motion to dismiss, or for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.*

**1289**

119 S.Ct. at 1675. No physical exclusion or denial of access to facilities is involved in this case.

A demonstration of physical exclusion, however, is not the sole means by which a plaintiff can demonstrate deprivation of an educational opportunity. Rather, a plaintiff need establish that the behavior so undermines and detracts from the victim's educational experience, that the student has effectively been denied access to an institution's resources and opportunities.

█ The behavior must also be severe enough to have a "systemic" effect of denying the victim equal access to an educational program or activity. We take this to mean that gender discrimination must be more widespread than a single instance of one-on-one peer harassment and that the effects of the harassment touch the whole or entirety of an educational program or activity.[12]

The record in this case reflects no concrete, negative effect on either the ability to receive an education or the enjoyment of equal access to educational programs or opportunities. None of the girls suffered a decline in grades and none of their teachers observed any change in their demeanor or classroom participation. The girls simply testify that they were upset about the harassment, although not enough to tell

their parents until months after it began. Two of the girls say they faked being sick four or five times in order not to go to school. This falls short of demonstrating a systemic effect of denying equal access to an educational program or activity.[13]

## IV

In sum, it bears emphasis that a private damages action under Title IX, grounded as it is on a judicially implied right of action shaped by the Supreme Court is analyzed differently than claims under Title VII or 42 U.S.C. § 1983, and is available only in limited circumstances. In this case, the harassment was not so severe, pervasive, and objectively offensive that it systemically deprived the victims of access to the educational opportunities of the school. Accordingly, the judgment of the district court is AFFIRMED.

---

12. In his dissent, Justice Kennedy appears to read the "systemic effect" requirement more narrowly: "The majority appears to intend that requirement to do no more than exclude the possibility that a single act of harassment perpetrated by one student on another can form the basis of an actionable claim." *Davis*, 526 U.S. at 677, 119 S.Ct. at 1687 (Kennedy, J., dissenting).

13. In comparison, the plaintiff in *Davis*, a fifth grade student, alleged a drop in grades, discovery by her father of a suicide note, seeking an audience with the principal along with other girls who had been victimized by the same student, and conduct that resulted in a sexual battery conviction for the haras-

ser. In *Murrell*, a physically disabled student was battered and sexually assaulted on multiple occasions resulting in self-destructive and suicidal behavior, causing her to leave school and enter a psychological hospital. *Murrell*, 186 F.3d at 1243–44. In *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir.2000), a girl was repeatedly harassed and intimidated by several boys for a lengthy period which extended from the seventh to ninth grades. She was diagnosed with depression and withdrew from school. We do not suggest that the consequences of harassment must always be as dire in order to trigger liability. However, the effect on the ability to receive an education must be real and demonstrable. Such was not the case in this matter.