[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12562

_____

A.P.,

                                        Plaintiff-Appellant,

*versus*

FAYETTE COUNTY SCHOOL DISTRICT,
DR. JOSEPH BARROW, JR.,
in his official capacity
DR. DAN LANE,
DR. CURTIS ARMOUR, JR.,
DR. BRANDI JOHNSON,
in their official and individual capacities,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 3:19-cv-00109-TCB

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and ED CARNES, Circuit Judges.

LUCK, Circuit Judge:

A.P., a high school student in the Fayette County School District, reported to a teacher and counselors that she was sexually assaulted by fellow student J.B. After investigating, counselors and administrators concluded that the sexual conduct was consensual, and A.P. and J.B. were expelled for violating a school policy prohibiting consensual sexual conduct at school. A.P. sued the school district for discriminating and retaliating against her, in violation of Title IX, and the school district and principal for violating her equal protection rights. The district court granted summary judgment for the school district and principal. After oral argument and careful review of the record and the briefs, we affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

A.P. and J.B. met during their first year at Fayette County High School in the 2016–2017 academic year. They were "acquaintances"—that is, they didn't have "actual conversation[s]" or interact on social media, but they said hello in the hallway.

At the beginning of their second year, J.B. approached A.P. "out of the blue" and asked "why [she] looked so lonely." This was

their first interaction of the 2017–2018 academic year, and A.P. "was kind of iffy about it" because she didn't "really associate with him like that." J.B. asked A.P. for her Instagram handle. They messaged and video chatted that day.

The next day, the two walked together "around the school building" and "hallways."

The day after that, J.B. told A.P. to stay after school. A.P. "stayed after school because he told [her] to," but when the school day ended, A.P. hadn't heard from J.B., so she went to her science teacher for extra credit work. While A.P. was doing extra credit, J.B. messaged her to "come out" of the classroom. A.P. asked, "Why?" J.B. said, "Say yo mom here[.] Just come on." A.P. responded, "My mom not here." J.B. replied, "SAY YO MOM HERE AND WALK OUT." A.P. said, "Ok hold on." J.B. insisted that she "HURRY" and told A.P. to meet him "[w]here [they] were last time." A.P. understood him to mean the place where they'd walked around the day before. She agreed to meet J.B. because she "thought he just wanted to talk or hang out."

Surveillance footage shows that A.P. met J.B. near the school gym. A.P. and J.B. were mostly out of camera view in an alcove, but the footage shows that they "embrace[d], exchange[d] a kiss," and held hands. The footage also shows that A.P. emerged from the alcove to "look[] down the hallway" at least eight times within the span of an hour.

After about fifty-three minutes, A.P. and J.B. came back into the camera's view. The footage shows that the students picked up

their belongings and walked down a hallway.  They talked, hugged twice, and then A.P. reached out for a third hug to "keep him okay with [her]" before they went their separate ways.

A.P. didn't tell anyone that night what had happened with J.B.  She messaged him, "Hey" and "Ft," asking him to FaceTime, but he didn't answer.  A.P. sent these messages to "be cordial with him so he wouldn't tell anybody what happened."

A.P. messaged J.B. again the next morning.  This time he answered.  He said, "Stop textin me," and told A.P. they were not "a thing" so she shouldn't "go around skoo tellin people" they were because she'd "look stupid."  A.P. texted back, "Never said we was," and J.B. responded, "Good and . . . don't look at me or speak to me."  A.P. asked, "Why?"  J.B. replied, "Cuz I said so."  A.P. said, "So you used me," and J.B. answered, "Used u for wat? . . .  We never did shii so wtf u talkin bout . . .  I never liked u."

### The Investigation

The same day J.B. told A.P. to stop texting him, a teacher A.P. trusted, Aminah Mitchell, saw A.P. and noticed "she looked visibly upset."  "[I]t was definitely clear" to Ms. Mitchell that, if A.P. "hadn't been crying" already, "she was about to cry."  Ms. Mitchell brought A.P. into her classroom to talk privately.  A.P. told Ms. Mitchell that J.B. "made her do things that she didn't want to do," and that J.B. "put his hand around her neck."  A.P. also showed Ms. Mitchell "some text messages" J.B. sent.

Ms. Mitchell thought A.P. may have been sexually assaulted and so she "tried to convince" A.P. to "talk to a counselor."

Although A.P. "didn't want to," Ms. Mitchell convinced her that she "need[ed] to talk to somebody about it."

Ms. Mitchell tried to report A.P.'s incident to the lead counselor, but she wasn't available. The lead counselor sent Counselor Jazzmon Parham to speak to Ms. Mitchell instead. Ms. Mitchell relayed A.P.'s report that J.B. "made [A.P.] do things she didn't want to do," and Ms. Mitchell "mentioned specifically the comment [A.P.] made about [J.B.'s] hand around her neck."

Counselor Parham told Assistant Principal Curtis Armour that they "might have had a rape in [the] school." Counselor Parham said that "it was reported to him that a student may have been forced to do something that she didn't want to do." Assistant Principal Armour directed Counselor Parham "to get a female counselor, interview the student," and report back if he needed to "take further action."

Counselor Parham "went to physically get" J.B., because "if there was a situation of sexual assault or misconduct," Counselor Parham "didn't want [J.B.] to be lost in the shuffle of [school] dismissal." Counselor Parham brought J.B. to a conference room and asked J.B. if he'd "been physically involved with a student at the school, and he said no."

Meanwhile, Counselor Jennifer Travis met with A.P., and Counselor Parham joined after he finished speaking with J.B. A.P. told the counselors she "did something [she] didn't want to do" but "didn't feel comfortable saying" more. Counselor Travis assured A.P. that anything she said wouldn't "leave the room," so A.P. "felt

more comfortable talking." Eventually, A.P. agreed to write on a sticky note what she did; A.P wrote a slang term for oral sex.

A.P. told the counselors that she "wasn't going to name" the male student involved and "just wanted everything to end." A.P. "wasn't trying to get him in trouble," she said, because she didn't like "confrontation." But when Counselor Parham asked A.P. whether the male student was J.B. because "other students ha[d] complained" about him, A.P. confirmed it was.

Counselor Parham observed that A.P. was "upset" with J.B. during the meeting. Counselor Parham recalled that he asked A.P. whether J.B. made her "do something [she] didn't want to do, or" whether she did "something that [she] wouldn't normally do because [she] like[d] him?" According to Counselor Parham, A.P. "responded that she liked him" and "did something she wouldn't normally do." Counselor Parham also recalled that A.P. said "she wanted to do something because it was his birthday" and she "didn't really want to, but she did it because she really liked him." But, according to A.P., Counselor Parham never asked her questions like that, and she was "never down for [J.B.]." A.P. explained she hadn't even known it was J.B.'s birthday until he told her that day, and she never offered him oral sex.

Based on these statements, the counselors concluded that the school was "dealing with a consensual sexual act"—that A.P. liked J.B., "wanted him to be her boyfriend," and was "upset that he wasn't talking to her as much either that day or the day before."

"[I]t just seemed that it was maybe a relationship gone awry," Counselor Travis explained.

The counselors told the lead counselor what they'd learned from meeting with A.P., and the lead counselor relayed the counselors' findings to Assistant Principal Armour. The lead counselor reported that A.P. and J.B. "had seemed to engage in a consensual sexual act in the school building" and that A.P. told Counselor Travis it was consensual. Based on this information, Assistant Principal Armour believed the sexual act was consensual.

A day later, Assistant Principal Armour spoke with Assistant Principal Brandi Johnson about the "consensual sexual relationship" between A.P. and J.B. The assistant principals went to Ms. Mitchell and spoke with her. Ms. Mitchell said A.P. "had reported to her that someone made her do something that she didn't want to do."

Assistant Principal Johnson removed A.P. from class and took her to Assistant Principal Armour's office. The assistant principals asked A.P. "what happened," but A.P. said she "wasn't going to talk" and "just want[ed] everything to be done with." Because the assistant principals couldn't convince A.P. to talk, they took her phone and put her in the in-school suspension room as "a holding area so that [they] could investigate with the male student." A.P. wasn't technically suspended at that point, but she wasn't "allowed to return to her regular classes."

While A.P. waited in the in-school suspension room, the assistant principals questioned J.B. At first, J.B. said he met up with

A.P. because of "something to do with a birthday present," and "she put her hands in his boxer shorts, but they didn't do anything." But J.B. ultimately admitted that A.P. performed oral sex on him, and he gave the impression that the sexual encounter was consensual.

The assistant principals reviewed the surveillance footage and reported the incident to Principal Dan Lane. They told the principal the footage showed two students going into the gym alcove, both students coming out "to see if people were around," and "the two students at the end of the video holding hands and kissing on the stairs."

The assistant principals spoke to A.P. and J.B. to let them know they'd "viewed the video." A.P. admitted that "she had performed oral sex on [J.B.]" but said "she didn't want to do" it.

After the students "separately admitted that the act had taken place," the assistant principals called their parents and told the principal that "both students had admitted to [the] oral sex transaction." The principal reviewed the surveillance footage himself. He found that in "the last ten minutes of the video" the students embraced, hugged, and kissed, and that when J.B. tried to leave, A.P. "pull[ed] him back" and "they embrace[d] again" before going "their separate ways."

The principal concluded the sexual act was "consensual." "There was nothing to substantiate or to make us believe that there had been any type of physical coercion," he explained. The principal contacted the assistant superintendent of operations to discuss

appropriate discipline for the students. The principal outlined "how the investigation unfolded," and told the assistant superintendent that A.P. had initially "claimed that it was not consensual" before "quickly admitt[ing] to . . . a counselor[] that she did it because she wanted to" and because "she liked him." The principal explained that he was thinking "a ten-day out-of-school suspension and referral to disciplinary tribunal was appropriate." The assistant superintendent confirmed with the principal that A.P. had "admitted" the act was consensual. The principal was "very adamant" that she had. The assistant superintendent then "agreed with" the principal's decision to suspend the students and proceed with disciplinary tribunals.

### The Disciplinary Tribunal and Appeal

The principal directed the assistant principals to "assign the discipline." The assistant principals informed A.P. that she was suspended for ten days and would have "a tribunal hearing" under Georgia's Public School Disciplinary Tribunal Act. *See* O.C.G.A. § 20-2-750. The principal charged A.P. with violating rule 28 of the Fayette County student code of conduct and recommended expulsion. Rule 28 prohibits, at all hours, the "commission of an act of sexual contact" on school grounds. A.P. received notice of the disciplinary hearing and was represented by counsel.

At the start of the hearing, the principal told the tribunal that he'd "prove with surveillance camera video and testimony of several [school] staff members" that A.P. violated rule 28 "by committing sexual impropriety" in the school building. He showed the

tribunal the surveillance footage and explained there was "a lot of time on the 90-minute video" during which the students were hidden from view in the alcove.

Ms. Mitchell, Counselor Parham, Counselor Travis, and Assistant Principal Armour testified for the school. Counselor Parham testified that A.P. told him she performed the sexual act "because she liked" J.B. Counselor Travis testified that A.P. never suggested she'd been assaulted and instead "seemed bothered" that after the sexual act occurred "the relationship" with J.B. hadn't "continued." A.P., however, testified that she repeatedly told J.B. she wouldn't perform oral sex and that J.B. grabbed her throat and kept telling her to do it "over and over and over."

At the end of the hearing, the principal declared, "There was no coercion here, only a young lady who chose to give another student a gift and became angry after the incident when the young man" didn't give "her the affection that she felt she deserved." After the hearing, the tribunal concluded that A.P. violated rule 28 by committing "sexual improprieties" and expelled her for the rest of the academic year.[1] A.P. appealed to the county school board, but the board affirmed her expulsion.

A.P. then appealed to the state board of education. She argued that her expulsion for violating rule 28 should be overturned because there wasn't evidence that she'd (1) meant to violate rule

---

[1] J.B. waived his right to a disciplinary hearing and accepted the same punishment.

28, (2) "caused a disruption or danger at school," or (3) consensually engaged in sexual conduct.

The state board affirmed A.P.'s suspension and expulsion. The board concluded that a rule 28 violation didn't require a showing that the student meant to violate the code of conduct or did anything disruptive or dangerous. The board also found that there was evidence in the record showing that A.P. engaged in a consensual sexual act. The board explained that, although A.P. initially told Counselors Travis and Parham that J.B. "forced her to perform oral sex," she then later admitted that "she did it because she liked him." The board noted that both counselors (and an assistant principal) had testified at the tribunal that A.P. "admitted that she performed oral sex on a male student because she liked him" and never "t[old] them that she was coerced into performing the sexual act." This evidence, the board determined, provided enough support to find that A.P. had violated rule 28.

*The Lawsuit*

A.P. sued the school district and principal in his official and individual capacities. She brought a Title IX sex discrimination claim against the school district, alleging that it was deliberately indifferent to her sexual assault report by refusing to take "effective steps to address [it]." A.P. also asserted a Title IX retaliation claim against the school district, alleging that, instead of appropriately addressing her sexual assault report, the school district retaliated against her by kicking her out of school. Finally, A.P. alleged that the school district and principal violated her equal protection rights

by "maintain[ing] a policy, custom, and practice" of responding to sexual assault reports with "deliberate indifference."

The school district and principal moved for summary judgment. As to the Title IX sex discrimination claim, the school district argued that A.P. hadn't been subjected to "pervasive" discrimination; nor had the school district been "deliberately indifferent" because it investigated her sexual assault complaint and found that the sexual act was consensual. And because the investigation showed that A.P. had engaged in consensual sexual conduct on school grounds, the school district maintained that "its decision to go through the disciplinary tribunal process" wasn't Title IX retaliation; it was discipline for violating rule 28. The school district's and principal's "thorough[] investigat[ion]" in response to A.P.'s sexual assault report—"a far cry from doing 'virtually nothing'" or responding with "deliberate indifference"—showed that neither defendant violated A.P.'s rights under the Equal Protection Clause.

The district court granted summary judgment for the school district and principal. As to A.P.'s Title IX sex discrimination claim, the district court concluded that J.B.'s conduct was not "pervasive" because the school district had received no reports of prior sexual misconduct. The district court also found that the school district hadn't responded with "deliberate indifference" to A.P.'s sexual assault report because it "investigat[ed]" the report and "ultimately concluded that A.P. engaged in consensual oral sex at school in violation of the code of conduct." As to the Title IX retaliation claim, the "evidence show[ed]," the district court explained, "that A.P. was

punished based on" the code of conduct violation and not, as she alleged, "because she reported a sexual assault." Finally, A.P.'s equal protection claim failed, the district court noted, because A.P. hadn't demonstrated that the school district and principal ever "acted with deliberate indifference" to known sexual assaults.

## STANDARD OF REVIEW

"We review a grant of summary judgment de novo, applying the same standard as the district court." *Newcomb v. Spring Creek Cooler Inc.*, 926 F.3d 709, 713 (11th Cir. 2019). "We must view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.* (cleaned up). "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## DISCUSSION

We break our discussion into three parts, tracking A.P.'s three claims. First, we consider whether the district court properly granted summary judgment for the school district on A.P.'s Title IX sex discrimination claim because the discrimination A.P. faced wasn't "pervasive" and the school district hadn't been "deliberately indifferent" to it. Next, we discuss whether the district court correctly granted summary judgment for the school district on A.P.'s Title IX retaliation claim because she was suspended and expelled for violating the student code of conduct—not in retaliation for reporting a sexual assault. Finally, we review whether the district court was right to grant summary judgment for the school district

and principal on A.P.'s equal protection claim because they were not deliberately indifferent to reports of sexual assault.

*A.P.'s Title IX Sex Discrimination Claim*

Under Title IX of the Education Amendments of 1972, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has said that this statute creates a private cause of action for "student-on-student" sex discrimination. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Federal funding recipients are liable for student-on-student sexual assaults if the recipients are "deliberately indifferent" to incidents, "of which they have actual knowledge, that [are] so severe, pervasive, and objectively offensive that [they] can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

The Supreme Court "imposed this high standard to guard against the imposition of 'sweeping liability.' Unlike an adult workplace, children 'may regularly interact in a manner that would be unacceptable among adults.'" *Hill v. Cundiff*, 797 F.3d 948, 969 (11th Cir. 2015) (quoting *Davis*, 526 U.S. at 651–52). "Some risk" of sexual misconduct "is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students." *Id.* "The high burden of *Davis* ensures [that] school districts are not financially crippled merely

21-12562                Opinion of the Court                15

because immature kids occasionally engage in immature sexual behavior." *Id.* at 970.

Here, the district court concluded A.P. had not met *Davis*'s high burden. J.B.'s conduct, the district court explained, was not "pervasive"; nor was the school "deliberately indifferent" to A.P.'s report of sexual assault.

<u>Pervasive</u>

We ask, first, whether the sex discrimination, of which the school district had actual knowledge, "was sufficiently 'severe, pervasive, and objectively offensive.'" *Id.* at 972 (quoting *Davis*, 526 U.S. at 651). The behavior must be pervasive "enough to have a 'systemic effect' of denying equal access to an education." *Id.* (quoting *Davis*, 526 U.S. at 652). "We take this to mean that gender discrimination must be more widespread than a single instance of one-on-one peer [sex discrimination] and that the effects of the [misconduct] touch the whole or entirety of an educational program or activity." *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003); *see also Davis*, 526 U.S. at 653 (noting that, generally, a "single instance" of one-on-one sex discrimination won't have "a systemic effect on educational programs").

Only in "unique" circumstances—when sexual assaults were part of a "continuous series of events" constituting a larger scheme—have we found a single sexual assault incident sufficient to satisfy Title IX. *See, e.g.*, *Hill*, 797 F.3d at 972–73; *Williams v. Bd. of Regents*, 477 F.3d 1282, 1297–98 (11th Cir. 2007). In *Williams*, for example, "a ringleader . . . lured the victim to his territory and then

conspired" with two other student-athletes "to commit two separate acts of sexual assault" (and a third attempted assault) "over two hours." *Williams*, 477 F.3d at 1298. This "gang rape," we concluded, "differ[ed] markedly from the rarely actionable . . . single incident mentioned in *Davis* and *Hawkins*" because it featured "a continuous series of events" and was therefore pervasive. *Id.* at 1288 n.3, 1298.

Similarly, in *Hill*, we found a single sexual assault incident sufficiently pervasive because school "administrators effectively participated" in it by setting the plaintiff up in a "botched rape-bait scheme" to "catch" the perpetrator "in the act." 797 F.3d at 972–73. We reviewed the perpetrator's documented past sexual assaults; the perpetrator's two weeks of sexually propositioning the plaintiff; the plaintiff's complaints about the perpetrator to the school board; the board's "'catch in the act' policy that motivated" the bungled "sting operation"; and, "after the rape, the [b]oard's utter failure to respond to [the plaintiff]'s traumatic injury and experience." *Id.*

The assault in *Hill*, we said, was "materially different" from "the rarely actionable, theoretical single incident mentioned in *Davis*." *Id.* at 973 (citation omitted). "Like the rape in *Williams*," a jury could find the perpetrator's rape "was the culmination of a continuous series of events"—two weeks of sexual harassment by the perpetrator, followed by additional sex discrimination by the school when it used the plaintiff as "bait"—and therefore "pervasive." *Id.* (cleaned up). But we cautioned that our decision rested

on *Hill*'s "highly unique and extreme" facts, which we hoped would "never again be repeated." *Id.*

They were not repeated here. The facts of this case (even when viewed in A.P.'s favor) are unlike the highly unique and extreme facts in *Williams* and *Hill*. The summary judgment evidence here showed that J.B. did not engage in a conspiratorial "scheme to target, isolate, and ultimately assault A.P." through "a continuous series of events." There was no "gang rape" conspiracy, like in *Williams*, or a school-orchestrated "sting operation" alongside prior documented sexual assaults, like in *Hill*. J.B.'s disciplinary record didn't include prior sexual assault incidents. And there was no summary judgment evidence showing that A.P. felt harassed by J.B. before the reported assault or that J.B. talked to A.P. as part of a premeditated scheme to assault her. In short, this appeal involves the severe single incident the Supreme Court has said isn't actionable under Title IX. *See Davis*, 526 U.S. at 652–53.

A.P. responds that she "need not" show that the discrimination was "pervasive" because the school district's "conduct here—punishing and ultimately expelling [her]—itself directly denied her equal access to the institution's resources and opportunities." But, for peer-to-peer sex discrimination to be actionable under Title IX, the Supreme Court has said that the discrimination *itself*—not the school's response to it—must be "pervasive." *See id.* at 650; *accord Hill*, 797 F.3d at 972; *Hawkins*, 322 F.3d at 1288–89. The single instance here falls short of that "high standard." *Hill*, 797 F.3d at 969.

Deliberate Indifference

A.P. also failed to establish that the school district was "deliberately indifferent" to her sexual assault report. *See Hill*, 797 F.3d at 973. "[F]unding recipients are deliberately indifferent 'only where the recipient's response to the [misconduct] or lack [of response] is clearly unreasonable in light of the known circumstances." *Id.* (quoting *Davis*, 526 U.S. at 648) "A clearly unreasonable response causes students to undergo" sex discrimination "or makes them more vulnerable to it." *Id.*

But a school district is not deliberately indifferent when, after it receives a sexual assault report, it conducts a reasonable investigation and determines, based on the record, that there's not enough evidence to support the allegation. *See, e.g.*, *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1260–61 (11th Cir. 2010); *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1373–74 (11th Cir. 2000); *Sauls v. Pierce Cnty. Sch. Dist.*, 399 F.3d 1279, 1285–87 (11th Cir. 2005). In *Doe*, for example, a student complained that she had been sexually harassed by her teacher. 604 F.3d at 1260. The student's "complaint was the first allegation of sexual misconduct against" the teacher by a student at the school. *Id.* The school board investigated. *Id.* It "obtained written statements" from the student and teacher; "timely reported the incident" to the school board's special investigative unit; "placed [the teacher] on administrative leave for the remainder of the semester"; and had an investigator interview the student and teacher, obtain sworn statements, and file a report with the school board's professional standards committee. *Id.* The

committee then reviewed the report and "concluded that there was insufficient evidence to support . . . further disciplinary action." *Id.* It was "unlikely," we said, "that this investigation, though imperfect, could be viewed as clearly unreasonable" because, "though the investigator" and the school district "arguably" should've taken additional measures, those "omission[s]" and "deficiencies" didn't amount to a decision by the school board not to remedy the violation. *Id.* at 1260, 1262 (cleaned up).

Likewise, in *DeKalb County*, the school district received a sexual assault complaint from a student against a teacher. 233 F.3d at 1372. It was the first allegation of sexual misconduct against the teacher. *Id.* The school started an investigation and interviewed the teacher, the victim, and other students. *Id.* at 1373. The principal—after wrongfully but reasonably "conclud[ing] that nothing of a sexual or inappropriate nature had taken place"—"instituted corrective measures." *Id.* at 1375. We found that, under these circumstances, the school district had "responded with anything but deliberate indifference" to the student's complaint. *Id.* at 1373.

*Sauls* is similar. There, the school district received several sexual assault reports against a teacher. 399 F.3d at 1285. It responded by "investigating the allegations and interviewing the relevant parties." *Id.* The investigator shared his findings with his supervisor, and the school district took "corrective action" by admonishing the teacher and directing her to avoid being alone with male students. *Id.* at 1286. These actions, we concluded, showed that

the school district's response was reasonable and not deliberately indifferent. *Id.* at 1285.

Here, the school district's response to A.P.'s sexual assault report was in line with the reasonable responses in *Doe*, *DeKalb County*, and *Sauls*. Right after A.P. suggested to Ms. Mitchell that she'd been sexually assaulted, she was referred to school counselors and J.B. was removed from the student body and segregated from A.P. The counselors investigated, met with A.P. and J.B., and in the end concluded that they were "dealing with a consensual sexual act." They reported their findings to the lead counselor, who relayed them to an assistant principal. Two assistant principals then followed up with A.P. and J.B., spoke with Ms. Mitchell, and reviewed the surveillance footage. They concluded that A.P.'s "claim didn't have substantiation and that [she and J.B.] had had consensual sex." They shared their findings with the principal, who reviewed the footage himself. Only then, after the school had investigated and concluded that the sexual conduct was consensual, did the principal suspend A.P. and refer her to the disciplinary tribunal.

Although the school's investigation may not have been "perfect," it was no less "thorough" than the ones we found reasonable in *Doe*, *DeKalb County*, and *Sauls*. *See Doe*, 604 F.3d at 1260–61. The school responded reasonably to A.P.'s report by diligently investigating and reaching a conclusion supported by the results of the investigation. The school was not deliberately indifferent.

We're unconvinced by A.P.'s two counterarguments. First, she argues that the state board of education was deliberately

indifferent to her sexual assault report because it interpreted rule 28 to "treat[] consensual and nonconsenual sexual contact as the same for disciplinary purposes."

But A.P. misreads the state board's decision. The state board distilled A.P.'s appeal down to three arguments: that her punishment should be overturned because there wasn't evidence that she (1) consented to oral sex, (2) intended to violate the student code of conduct, or (3) caused a disruption or danger at school. The state board addressed all three arguments. It began with the second and third, which it explained were irrelevant because rule 28 didn't require evidence of intent to violate the code of conduct or evidence "that the prohibited conduct caused a disruption of or danger to the school."

The state board then pivoted to the first argument: consent. The state board explained that, "at the disciplinary hearing, two school counselors and an assistant principal testified" that A.P. "did not tell them that she was coerced" but instead "admitted that she performed oral sex on a male student because she liked him." The state board found that this evidence supported the school district's finding that A.P. had engaged in sexual conduct consensually. The state board never adopted an interpretation of rule 28 that read out a consent requirement.

Second, A.P. argues that, if a student reports that she was sexually assaulted, the school district is prohibited by Title IX from ever disciplining her for engaging in that sexual act—regardless of evidence showing the conduct was consensual. Even if the

evidence shows that the report was more likely than not false, A.P. contends that any lingering possibility that the report was true prohibits disciplinary action. A.P. insists that discipline is appropriate only when there's "incontrovertible evidence" that the student's report was false.

This "incontrovertible evidence" standard is not the law. The law, as set forth by the Supreme Court in *Davis*, is that so long as a school district's response to a sexual assault report isn't "clearly unreasonable in light of the known circumstances," the school retains "flexibility" to make whatever "disciplinary decisions" it considers appropriate. *See Davis*, 526 U.S. at 648. And we must "refrain from second-guessing" those decisions. *Id.*

As in *Doe*, *DeKalb County*, and *Sauls*, A.P.'s school received a sexual assault report, investigated it, examined the evidence, reached a determination based on that evidence, and only then imposed corrective measures. *See* 604 F.3d at 1260–66; 233 F.3d at 1373–74; 399 F.3d at 1285–87. That's not clearly unreasonable. The district court didn't err in entering summary judgment on A.P.'s Title IX sex discrimination claim.

## A.P.'s Title IX Retaliation Claim

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). "[W]hen a funding recipient retaliates against a person *because* [s]he

complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.*

Title IX retaliation claims are analyzed under the same framework that we use for Title VII retaliation claims. *See, e.g., Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018) ("Like our sister circuits, we thus apply familiar Title VII retaliation concepts to the requirements of a Title IX retaliation claim."); *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 & n.3 (9th Cir. 2012) ("Until now, we have not had occasion to say what a plaintiff must prove to prevail on a retaliation claim under Title IX. We join our sister circuits in applying the familiar framework used to decide retaliation claims under Title VII."); *see also Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017); *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 & n.2 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017).

To prevail on a Title IX retaliation claim, the plaintiff must establish a prima facie case that: (1) she reported the discrimination; (2) she suffered an adverse action; and (3) there's a causal connection between the report and adverse action. *See Jackson*, 544 U.S. at 174. If the plaintiff establishes her prima facie case, the burden shifts to the defendant "to articulate a legitimate, nonretaliatory reason for the adverse action." *Tolar v. Bradley Arant Boult*

*Cummings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021). If the defendant does so, "the burden shifts back to the plaintiff to establish that the reason offered by the [defendant] was not the real basis for the decision, but a pretext for retaliation." *Id.* (citation omitted).

The "inquiry into pretext" turns on the decisionmaker's subjective "beliefs" and reasons for taking the adverse action—even if those beliefs and reasons turn out to diverge from "reality as it exists outside of the decisionmaker's head." *See id.* at 1299 (quoting parenthetically *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)). Thus, the retaliation claim will fail unless the plaintiff can show that the decisionmaker's true beliefs and reasons were retaliatory. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc). The plaintiff must demonstrate that the legitimate reasons proffered by the defendant are sufficiently riddled with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" to allow a reasonable factfinder to "find them unworthy of credence." *Id.* at 1136 (citation omitted).

Applying that framework here, we assume (without deciding) that A.P. established a prima facie case of retaliation. But, even with that assumption, the school district rebutted the prima facie case by articulating a legitimate, nonretaliatory reason for disciplining A.P.: her violation of rule 28. And A.P. failed to show that reason was pretextual. The principal gave a specific factual basis—stemming from the findings of the investigation and his personal review of the surveillance footage—to support his belief that A.P.

engaged in consensual sexual conduct at school in violation of rule 28. The principal concluded that the sexual conduct was "consensual" because "[t]here was nothing to substantiate" A.P.'s initial claim of sexual assault or otherwise cause him to "believe" that A.P. had been coerced.

When the investigation ended and the principal consulted the assistant superintendent about disciplining the students, the principal was "very adamant" that, although A.P. had initially claimed the sexual act "was not consensual," she had "quickly admitted" to a counselor that it in fact was consensual. The principal asked the assistant superintendent what discipline would be appropriate for A.P.'s rule 28 violation, explaining that he was leaning toward "a ten-day out-of-school suspension and referral to disciplinary tribunal."

Because the principal's subjective belief that A.P. engaged in consensual sexual conduct at school—even if mistaken—could've motivated a reasonable decisionmaker to take disciplinary action, A.P. needed to address the principal's "reason head on and rebut it." *See Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (explaining that a plaintiff cannot establish pretext "by simply quarreling with the wisdom of [a] reason" that might motivate a reasonable decisionmaker (citation omitted)). But A.P. didn't do so. The summary judgment evidence showed that the principal disciplined A.P. because he believed she violated rule 28 by engaging in consensual sexual conduct at school. There's no evidence that he believed anything else. A.P. never argued otherwise.

Instead, A.P. insists that the "close temporal connection" between her sexual assault report and her discipline showed that the rule violation was a pretext for retaliation. But temporal proximity can't, by itself, show pretext. *See Gogel*, 967 F.3d at 1137 n.15 ("While close temporal proximity between the protected conduct and the adverse . . . action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient.").

Because the school district disciplined A.P. for engaging in consensual sexual conduct at school—and A.P. hasn't shown the school district's reason was pretextual—her Title IX retaliation claim can't survive summary judgment.

### A.P.'s Equal Protection Claim

"Section 1983 allows persons to sue individuals or municipalities acting under the color of state law for violations of federal law." *Hill*, 797 F.3d at 976. "One such law is the Equal Protection Clause, which confers a federal constitutional right to be free from sex discrimination." *Id.* (citation omitted).

To establish a sex discrimination claim against a municipality under the Equal Protection Clause, a plaintiff must show that a municipal official acted with "deliberate indifference" by "disregard[ing] a known or obvious consequence of his action." *Id.* at 977 (citation omitted). A similarly "stringent standard of fault" applies to a municipal official's individual liability. *Id.* at 977–78 (citation omitted). An official may only be held personally "liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Id.* at 978 (citation omitted). The "plaintiff

must prove the individual defendant actually knew of and acquiesced in the discriminatory conduct." *Id.* (cleaned up).

In other words, A.P.'s equal protection claim against the school district and principal—like her Title IX sex discrimination claim against the school district—required a showing of "deliberate indifference" to her sexual assault report. *See id.* at 976–78. But, as we explained earlier, the summary judgment evidence (even when viewed in A.P.'s favor) showed that the school district and principal were not deliberately indifferent to A.P.'s report. For the same reasons, the school district and principal were not deliberately indifferent for purposes of A.P.'s equal protection claim. Summary judgment was appropriately entered.[2]

**AFFIRMED**.

---

[2] Because A.P. didn't show that the school district and principal were deliberately indifferent to her sexual assault report, we don't need to address their additional arguments that the principal wasn't a final policymaker and that he was protected by qualified immunity.